**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| **JOHN DOE., A MINOR, THROUGH HIS PARENT AND GUARDIAN, MARY DOE; AND MARY DOE, INDIVIDUALLY** | ) | |
| **PLAINTIFFS.** | ) | |
| **VS.** | ) | **NO. 1:25-CV-0005 CEA-CHS JURY DEMANDED** |
| **HAMILTON COUNTY DEPARTMENT OF EDUCATION** | ) | |
| **DEFENDANT.** | | |

# FIRST AMENDED COMPLAINT

**COMES NOW THE PLAINTIFF, JOHN DOE**, a minor, by and through his parent, Mary Doe, and Mary Doe, individually, and submits this First Amended Complaint showing:

## I. PARTIES, JURISDICTION, AND VENUE

1. The Plaintiffs are John Doe who is a citizen and resident of Hamilton County, Tennessee, where he attends public school. His case is brought through his natural parents, Mary Doe, and she makes claims for herself, individually.

2. The Defendant, Hamilton County Department of Education (HCDE), is a county government school district, organized under the laws of the State of Tennessee, providing public education to students of Hamilton County. It receives federal funds.

3. This action arises out of the following federal statutes: Americans with Disabilities Act, 42 U.S.C. §12132 et. seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. §794; Section 1983 and the First Amendment to the United States Constitution; the Equal Protection Clause of the Fourteenth Amendment; and the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331.

4. Venue is appropriate in this Court under 28 U.S.C. §1391(b) as the cause of action arose in Hamilton County and the Defendant may be found in Hamilton County.

## II. INTRODUCTION

5. John Doe, thirteen, has Autism Spectrum Disorder and an intellectual disability. He tried to protect his stuffed toy bunny from others by stating that his backpack would "explode" if on looked inside. Of course, it wouldn't *really* explode.

6. John's statement—clearly invalid, transient, and owing to his disabilities— was not a *true threat.* But HCDE has a custom and practice of referring *non-threats,* regardless of intent, regardless of disability, and regardless of validity, to law enforcement. In other words, HCDE's custom and practice treats even *non-threats* of mass violence as reportable under Tenn. Code Ann. §39-16-517. It is criminalizing non-threatening speech of a student with a disability by tendering the speech to its contracted student resources officer (SRO).

7. John was handcuffed, he experienced terror he could not understand, and he was charged with a felony. *Because of* the felony charge that HCDE occasioned, HCDE then removed him from school altogether.

8. This violates the Americans with Disabilities Act, the Rehabilitation Act, and the Constitution of the United States. And it is causing Doe, and other children like him, extraordinary

harm. Accordingly, he and his mother bring this suit for injunctive relief and damages. It is their aim to create change within HCDE, so that transient threats (non-threatening speech) are handled appropriately, particularly for students with disabilities like John. This can be accomplished, *inter alia*, through systems such as the "Comprehensive School Threat Assessment Guidelines," CSTAG, a practical, step-by-step procedure for conducting assessments and resolving the simple cases easily, without harming students with disabilities through false felony charges.

## III. FACTS

*HCDE Knew of John's Documented Disabilities*

9. John is 13 years old, but his maturity is significantly delayed due to medical impairments of Autism Spectrum Disorder and an Intellectual Disability. He has a "disability" under the ADA and Section 504, one that substantially limits one or more major life activities of such individual, 42 U.S.C.S. § 12102(1)(A), because John is substantially limited in thinking, communicating, understanding, learning, social interaction, and cognitive functioning.[1]

10. John's substantial limitations were well-documented by HCDE. Months before, May 22, 2024, HCDE completed a psychological report for John through its school psychologist. His verbal comprehension is "extremely low range," the second percentile, and he is in the "very low range" of cognitive functioning. On the Comprehensive Test of Nonverbal Intelligence (CTONI-2), an intelligence test that measures one's cognitive and reasoning abilities, Doe received

[1] Courts construe the term disability broadly. 42 U.S.C.S. § 12102(4)(A). As to the term "impairment," the applicable Department of Justice regulations provide that the term physical or mental impairment includes ADHD and dyslexia and other specific learning disabilities. 28 C.F.R. § 36.105(b)(2).

a full-scale IQ score of 68. And his academic skills, as measured by the Kaufman Test of Educational Achievement (KTEA), were less than 1% across all areas.

11. Around that same time, May 23, 2024, HCDE completed a Speech and Language Evaluation. Teachers reported his poor language skills. Testing revealed his expressive language abilities as below average. In terms of socially appropriate speech ("pragmatics" or "social language"), his vocabulary is highly limited such that he could answer but a single question on the Social Language Test for Adolescents, resulting in a rank below the first percentile.

12. John's disabilities also substantially impact his behaviors. HCDE documented, through a "Behavior Intervention Plan," that he sometimes makes "self-defeating comments" and "verbal threats toward others," resulting in a plan to mitigate these behaviors.

13. In short, HCDE knew of, tested for, and documented, John's disabilities.

*The Events of August 8, 2024*

14. This is "Bonnie the Bunny," a popular plush toy for kids:




15. Bonnie is John Doe's favorite toy. John carries Bonnie to school in his backpack.

16. On August 8, 2024, the second day of school at Ooltewah Middle School, John carried Bonnie in his backpack to his social studies class. Bonnie is precious to John. On this day, John said no one could look inside his backpack or else it would "blow up." It would not *really* blow

up, of course, because a stuffed bunny does not explode, but John, due to his disabilities, believed this would protect Bonnie from others. So, in his way, he spoke out.

17. John's teacher, who heard his transient comment, understood John is a student with a disability impacting his thinking and social interactions. To be safe, HCDE staff opened John's backpack to find the stuffed bunny and nothing else of harm.

18. Based upon the literal words used, John was sent to a counselor who, like the teacher, knew and understood John did not make a valid threat of mass violence. That should have been the end of it. His speech was no true threat.

19. But it wasn't the end of it. HCDE's custom and practice is to call the police *regardless* of validity and regardless of intellectual disability. So HCDE reported John Doe to law enforcement as making a threat of mass violence in spite of his Autism Spectrum Disorder and intellectual disability and in spite of knowing that, in truth, he made no valid threat at all.

20. HCDE's custom and practice is tragically flawed. First, HCDE is criminalizing non-threatening speech of a child with a disability. Even though it "immediately" cleared John Doe from any valid threat of mass violence, it reported him as making a threat of mass violence anyway.[2] (HCDE claims it "notified a School Resources Officer employed by Hamilton County of the statement made by Doe" even though its "immediate" threat assessment cleared him).[3]

21. Second, by failing to include law enforcement *on the threat assessment team,* as opposed to an arm of state prosecution, it withholds critical educational information about John's

---

[2] According to HCDE's own Answer, it "immediately began a threat assessment" and decided no discipline was warranted. (D.E. 8, Answer, p. 1). Doe was "immediately" taken to the counselor's office and the principal advised that counselors or social workers perform the threat assessment.

[3] (D.E. 8, Answer, p. 1).

disability. Children with an intellectual disability are exempt from prosecution under the threat of mass violence law.[4]

*HCDE Criminalizes Invalid or "Transient" Threats as Being Threats of Mass Violence*

22. Threats of *mass violence* are not any old threat. They are threats "*a reasonable person* would conclude could lead to the serious bodily injury … or the death of two or more persons."[5] Only if the threat is *valid* must the student be reported to law enforcement.[6] And only if the threat is *valid* must the student be expelled.[7]

23. For a threat to be valid, the speaker must "recklessly" threaten mass violence.[8] This means that, first, the speaker must be *aware* of a substantial and unjustifiable risk that others may perceive their speech as a threat of mass violence. Second, they must then "consciously disregard" that risk. John, because of disability and his tender age, was not aware of the risk. Nor could he consciously disregard it.

24. Even if the law applied to John (and it does not), and even if HCDE suspected that John's *potential* threat was a "valid" threat of mass violence (and it did not), *even then,* Tennessee law contains mandatory procedures to determine the validity of a threat, valid threats versus transient or non-threats.

25. Tennessee law requires school districts to create a "threat assessment team." The threat assessment team is used to distinguish transient threats from valid threats of mass violence. The threat assessment team's purpose is "to develop comprehensive intervention-based

---

[4] Tenn. Code Ann. §39-16-517(b)(2).
[5] Tenn. Code Ann. § 39-16-517 (a)(1).
[6] Tenn. Code Ann. §49-6-3401(g)(5), (6)
[7] *Id.*
[8] Tenn. Code Ann. §39-16-517(b)(1).

approaches to prevent violence, manage reports of potential threats, and create a system that fosters a safe, supportive, and effective school environment."[9]

26. These threat assessment teams are not new.[10] And they must include *both* "law enforcement personnel" and LEA representatives, working in concert, not separately.[11]

27. HCDE has Student Resource Officers within its schools pursuant to a Memorandum of Understanding with Hamilton County's Sheriff's Department. But instead of partnering with them as part of a school-side threat assessment team, with full access to FERPA-related documentation of disability, it instead creates separation of school versus law enforcement. That division results in discriminatory decisions and unnecessary, even false, arrests.

28. HCDE calls its dual system "School Side Versus Law Side." On the "school side," HCDE knew John was *not* making a valid threat of mass violence. That should have been the end of it. But it reported him to law enforcement anyway.

29. Then, on the separate "law side," HCDE reported an *invalid* threat to its contracted member of law enforcement, the SRO, meaning law enforcement received a threat of mass violence without being included on the threat assessment team. Foreseeably, John was arrested and charged with a felony of mass violence for what consisted of his statement about protecting his stuffed toy bunny from others. HCDE effectively made a false report of non-threatening speech by a person with a disability who is not even subject to the statute.

[9] Tenn. Code Ann. §49-6-2701(a).
[10] Tenn. Code Ann. §49-6-2701(a).
[11] *Id.* at (b).

30. HCDE's system is profoundly flawed. It creates the likelihood, if not certainty, that innocent children are arrested and charged with a felony for invalid threats (transient ones) or, as in this case, statements made by a person with a disability.

31. Once the criminal charges *are* filed (over what HCDE already determined was not a threat), HCDE goes back and removes the student from school based upon the "pending legal charges" that its own flawed practice created in the first place. Discriminatory *school discipline* results from the *discriminatory* referral and subsequent arrest.

32. This case serves as an excellent example of how HCDE's custom and practice creates an ecosystem of compounding discrimination. In fact, four days after John made the bunny-statement, now August 12, 2024, HCDE held a meeting called a "manifestation determination" to determine whether John's disability caused his statement. HCDE concluded, rather obviously, that his conduct *was* caused by his disability and he was a "low level" threat or even lower.

33. Section 504 prohibits schools from expelling or removing students for "manifestations" of disability. And according to HCDE policy, for a "low level" threat, a student can only receive a maximum of two days of in-school suspension. Yet HCDE expelled John from school entirely, with HCDE recommending *homebound services* due to the very criminal charges it occasioned.

34. John Doe and Mary Doe have suffered substantial emotional harm from HCDE's conscious-shocking, discriminatory failure to follow the law by distinguishing true or valid threats from transient or non-threats. John has suffered the unnecessary trauma of an arrest he could not understand. He's been isolated from his school community, his reputation stained by an alleged act of mass violence that was, in fact, anything but.

*Injunctive Relief is Necessary to Address HCDE's Widespread Custom and Practice*

35. HCDE's failures are entirely foreseeable and continuing. Contrary to the law and HCDE policy, on September 6, 2024, HCDE's superintendent advised all students and parents that threats of mass violence, "*regardless of intent or ability to carry out,*" must be charged as a felony. This is wildly inaccurate, irresponsible, and serves to harm innocent children, particularly ones with disabilities like John.

36. Also on September 6, 2024, the Community Schools Coordinator for Hamilton County Schools advised all students and families that assessment protocols are followed "without regard to … the actual intent of the student." Again, this is wildly inaccurate and harmful.

37. Adequate training for school personnel is necessary to distinguish "transient" threats by students from *valid* threats of mass violence. Transient threats can be quickly and readily resolved because the threat is an expression of feelings and does not reflect a substantive intent to harm someone.[12] And threatening statements made by students with disability can be excepted.

38. For example, the Comprehensive School Threat Assessment Guidelines (CSTAG) is an evidence-based model for schools to use in conducting threat assessments in K-12 schools.[13] Preliminarily, it recognizes that: "Youth frequently make threatening statements that are not serious and engage in aggressive behavior that ranges from horseplay to serious assault. It is important not to over-react."[14] Thus, it uses the threat assessment to distinguish "transient

[12] In a field test of these guidelines in 35 primary and secondary schools that responded to 188 threats of violence, approximately 70 percent of the cases were resolved as transient threats.

[13] Available at https://education.virginia.edu/documents/yvpcomprehensive-school-threat-assessment-guidelines-overviewpaper2020-05-26pdf (last visited March 6, 2025)

[14] *Id.*

threats," a broad category of threats—"most threats"—which do *not* reflect a genuine intent to harm others.[15]

39. Currently, HCDE's custom and practice is one of deliberate *overreaction.* In cases where violence is obviously not imminent, including transient threats and threats by children with disabilities, and even threats determined to be *invalid* threats of mass violence, HCDE refers them to law enforcement for possible prosecution anyway. As shown above, HCDE's custom and practice is endorsed from the superintendent on down.

40. The field-study-tested CSTAG utilizes safeguards for statements which are *not a threat,* and for students with disabilities, and it is consistent with Tennessee law:

*[see graphic next page]*

---

15 *Id.*



**THREAT ASSESSMENT AND RESPONSE PROTOCOL©**

Comprehensive School Threat Assessment Guidelines

**OVERVIEW**

A threat typically is a communication of intent to harm someone that may be spoken, written, gestured, or expressed in some other form, such as via text messaging or other digital means. An expression of intent to harm someone is considered a threat regardless of whether it is communicated to the intended target(s) and regardless of whether the intended target is aware of the threat. Threats also may be implied by behavior that an observer would reasonably regard as threatening, planning, or preparing to commit a violent act. When in doubt, treat the communication or behavior as a threat and conduct a threat assessment. Threats that are not easily recognized as harmless (e.g., an obvious joke that worries no one) should be reported to the school administrator or other team members. The administrator or another team member makes a preliminary determination of the seriousness of the threat, in consultation with one or more team members. The student, targets of the threat, and other witnesses should be interviewed to obtain information using this protocol. A *transient* threat means there is no sustained intent to harm and a *substantive* threat means the intent is present (or not clear) and therefore requires protective action. This form is a guide for conducting a threat assessment, but each case may have unique features that require some modification.

A threat assessment is not a crisis response. If there is indication that violence is imminent (e.g., person has a firearm at school or is on the way to school to attack someone), a crisis response is appropriate. Take immediate action such as calling 911 and follow the school crisis response plan.

**School Threat Assessment Decision Tree***

**Step 1. Evaluate the threat.**
Obtain a detailed account of the threat, usually by interviewing the person who made the threat, the intended victim, and other witnesses. Write the exact content of the threat and key observations by each party. Consider the circumstances in which the threat was made and the student's intentions. Is there communication of intent to harm someone or behavior suggesting intent to harm?

No → Not a threat. Might be an expression of anger that merits attention.

Yes ↓

**Step 2. Attempt to resolve the threat as transient.**
Is the threat an expression of humor, rhetoric, anger, or frustration that can be easily resolved so that there is no intent to harm? Does the person retract the threat or offer an explanation and/or apology that indicates no future intent to harm anyone?

Yes → Case resolved as transient; add services as needed.

No ↓

**Step 3. Respond to a substantive threat.**
For all substantive threats:
a. Take precautions to protect potential victims.
b. Warn intended victim and parents.
c. Look for ways to resolve conflict.
d. Discipline student, when appropriate.
Serious means a threat to hit, fight, or beat up whereas very serious means a threat to kill, rape, or cause severe injury with a weapon.

Serious → Case resolved as serious substantive threat; add services as needed.

Very Serious ↓

**Step 4. Conduct a safety evaluation for a very serious substantive threat.**
In addition to a-d above, the student may be briefly placed elsewhere or suspended pending completion of the following:
e. Screen student for mental health services and counseling; refer as needed.
f. Law enforcement investigation for evidence of planning and preparation, criminal activity.
g. Develop safety plan that reduces risk and addresses student needs. Plan should include review of Individual Educational Plan if already receiving special education services and further assessment if possible disability.

↓

**Step 5. Implement and monitor the safety plan.**
Document the plan.
Maintain contact with the student.
Monitor whether plan is working and revise as needed.

41. Accurately distinguishing between transient and substantive threats avoids over-reacting to threats that are not serious while focusing attention on serious threats that merit

protective action. Without training on correct procedure, HCDE will continue violating students' rights under the First Amendment and, in this case, disability and Equal Protection laws.

42. After John was handcuffed, arrested, and taken to juvenile detention in spite of his known disability, his grief-stricken mother asked the principal how this could possibly happen and whether it could happen to him again. On August 14, 2024, the principal answered in the affirmative: "*I will have to follow the same protocol, until our policy changes*." Accordingly, the need for injunctive relief is critical.

## IV. LEGAL CLAIMS

### Count 1: The Americans with Disabilities Act

43. HCDE is using its contracted relationship with an SRO to criminalize non-threatening speech of a student with a disability—who is not even subject to the mass violence statute.

44. "In the ADA, Congress provided [a] broad mandate" to "effectuate its sweeping purpose[ to] ... forbid[] discrimination against disabled individuals in major areas of public life,[including] ... public services ...." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). It is "a milestone on the path to a more decent, tolerant, progressive society." *Id.* (quoting *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring))

45. The ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130.

46. Title II of the ADA applies to all of the activities of public entities, including school districts that provide public education. John Doe is a qualified individual with a disability; the Defendant is subject to the ADA; and he was denied the opportunity to participate in or benefit from the Defendant's services, programs, or activities, or was otherwise discriminated against by the defendants because of his disability, or through reasonable modifications to avoid said discrimination.

47. More specifically, the implementing regulations to ADA define an individual with a disability as follows: "(a)(1) Disability means, with respect to an individual: (i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (ii) A record of such an impairment; or (iii) Being regarded as having such an impairment . . . ." *Id.* § 35.108. Doe meets this criteria due to his Autism Spectrum Disorder and/or Intellectual Disability.

48. The regulations implementing Title II of the ADA state that [a] public entity, in providing any aid, benefit, or service, may not, *directly* or through *contractual, licensing, or other arrangements*, on the basis of disability . . . (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are

as effective as those provided to others; . . . [or] (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. *Id.* § 35.130(b)(1)(i), (ii), (iii), (iv), (vii).

49. Further, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State." *Id.* § 35.130(b)(3).

50. Thus, the regulations implementing Title II of the ADA require that public entities avoid unnecessary policies, practices, criteria or methods of administration that have the effect or tendency of excluding or discriminating against individuals with disabilities. *Id.* §§ 35.130(b)(3), (8).

51. Further, Title II regulations require public entities to "make reasonable modifications" to their programs and services "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7)(i). In this case, this requires policy exclusions or modifications for behaviors that are a manifestation of disability, or adopting a policy to support a student's behavioral needs. And it also requires, as here again, making modifications to policies or practices involving interactions between students with disabilities and the SROs/law enforcement personnel who operate inside the schools.

52. Defendant engaged in intentional discrimination through gross misjudgment, and also failed to reasonably modify its policies and practices for John Doe's disability. It discriminatorily reported John to law enforcement. Its contracted officer then discriminatorily arrested John Doe. It discriminatorily removed John from school. And it failed to modify its policies and procedures to ensure that such reporting and arrests for a child with a disability do not occur.

**Count 2. Section 504 of the Rehabilitation Act**

53. As with the ADA, HCDE is using its contracted relationship with an SRO to criminalize non-threatening speech of a student with a disability—who is not even subject to the mass violence statute.

54. Section 504 is a federal law that protects individuals with disabilities in programs and activities that receive federal financial assistance. 29 U.S.C. § 794; 34 C.F.R. §§ 104.1, .4. Specifically, Section 504 states that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . " 29 U.S.C. § 794(a). Thus, Section 504 applies to all school districts that receive federal financial assistance. *Id.* § 794(b)(2); 34 C.F.R. § 104.31. Section 504, too, requires provision of reasonable modifications. 29 U.S.C. 794(a); 28 C.F.R. §41.53.

55. A student with a disability satisfies the definition of a "qualified handicapped person" if the student "(i) has a physical or mental impairment which substantially limits one or more major life activities [such as thinking or learning], (ii) has a record of such an impairment, or

(iii) is regarded as having such an impairment." 34 C.F.R. § 104.3(j). Doe meets this criteria due to his Autism Spectrum Disorder and/or Intellectual Disability.

56. Doe is a qualified individual with a disability; the Defendant is subject to the ADA or the Rehabilitation Act; and he was denied the opportunity to participate in or benefit from the Defendant's services, programs, or activities, or was otherwise discriminated against by the defendants because of his disability, or though reasonable modifications to avoid said discrimination.

57. For matters of discipline, schools must avoid discrimination based upon one's disability. This obligation extends to school-based referrals to law enforcement. Thus, schools must make reasonable modifications to their criteria, policies, practices or procedures when necessary to avoid discrimination on the basis of disability. 34 C.F.R. § 104.4 (Section 504 regulation prohibiting disability discrimination). Of course, school policy must also avoid discriminatory different treatment and/or disparate treatment in the first place.

58. In this case, Section 504 compliance requires HCDE to distinguish transient or non-threats from true threats of mass violence when assessing the potentially threatening speech of students with disabilities. This requires policy exclusions or modifications for behaviors that are a manifestation of disability, or adopting a policy to support a student's behavioral needs. And it also requires, as here again, making modifications to policies or practices involving interactions between students with disabilities and the contracted SROs/law enforcement personnel who operate inside the schools. See 34 C.F.R. § 104.4 (1),(4); see 28 C.F.R. § 35.130(b)(3),(7).

59. Defendant engaged in intentional discrimination through gross misjudgment, and also failed to reasonably modify its policies and practices for John Doe's disability. It

discriminatorily reported John to law enforcement. Its contracted officer then discriminatorily arrested John Doe. It discriminatorily removed John from school. And it failed to modify its policies and procedures to ensure that such reporting and arrests for a child with a disability do not occur.

**Count 3. Section 1983 and First Amendment**

60. HCDE is deciding that speech—here the statement of a boy with a disability protecting his stuffed toy bunny—is *not* a true threat (or any threat), but it is criminalizing that speech anyway.

61. The First Amendment protects the right to free expression. A key exception concerns "*true threats*" of violence. "[T]he 'true' in that term distinguishes [true threats] from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late.')."[16] Doe's speech was exactly that kind of hyperbole to protect his stuffed bunny. His speech was not a "true" threat.

62. Nor did Doe's speech "*substantially and materially disrupt*" the learning environment.[17] And he was not indecent, lewd, or vulgar with his speech.

63. Doe's teacher continued teaching. There was no evacuation, no instructional breaks, no material and substantial disruption. In fact, the "immediate" threat assessment cleared Doe of making any threat of mass violence.

---

[16] *Watts v. United States*, 394 U.S. 705, 708 (1969) in *Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

[17] *Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503 (1969).

64. HCDE's decision to report Doe to law enforcement under these circumstances and, then, remove him from school altogether violates the First Amendment. Additionally, under Section 1983, HCDE was deliberately indifferent by failing to train its decision-makers about not reporting as a crime what was obviously *not* a true threat. This caused Doe both educational and emotional harm.

65. Defendant, under color of state law, infringed on Doe's First Amendment rights and did so with deliberate indifference.

**Count 4. Equal Protection**

66. Section 1983 provides a cause of action for an individual whose constitutional or federal rights are violated by those acting under color of state law:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

67. John Doe is a United States citizen with rights under Section 1983. "The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011).

68. The clause is "essentially a direction that all persons similarly situated should be treated alike." *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012)(quoting *City*

*of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).

69. HCDE treated Doe differently *because of* a disability. He thoughts, language, and expressions were disability linked—"manifested" as HCDE would find—but instead of relieving him of a report prosecution, HCDE reported him anyway. HCDE's training program on threats of mass violence, and on threat assessments, is inadequate for the tasks required. It acted arbitrarily, irrationally, and unconstitutionally.

**Count 5. Section 1983 and Fourteenth Amendment Substantive Due Process**.

70. Defendant deprived Doe of a liberty or property interest,[18] under color of law, in a conscious-shocking manner by removing him for stating that his backpack could blow up. Defendant clearly knew this was *not* a valid threat of mass violence but treated it as so anyway—reporting him for a crime notwithstanding its own threat assessment clearing him.

71. Defendant violated DOE's substantive due process rights by removing him from school based upon a criminal charge *that it created*. It acted arbitrarily, irrationally, and unconstitutionally.

For relief, Plaintiffs seek:

a. Declaratory relief of the Constitutional violations.

b. Injunctive relief to include training related to the correct application of Tennessee's mass violence law, including training on threats assessments to distinguish transient threats and threats by students with disabilities, to avoid violation of disability laws, First Amendment, and the Constitution.

[18] Tennessee students enjoy a property interest in education.

c. Injunctive relief enjoining Defendant from using its protocols to report Doe for a crime for disability-manifested speech or for a crime of mass violence for speech that is *not* a valid threat of mass violence.

d. Reasonable modifications of HCDE policies, procedures, and practices to account for Doe's disability and manifestations of his disability, including not reporting transient or invalid threats as potential crimes. This also includes creating valid procedures for threat assessment teams and the complementary use of SROs/law enforcement personnel who operate inside the schools.

e. Compensation for humiliation, mental anguish, and damage to Doe's reputation.[19]

f. Compensation for humiliation and mental anguish to Mary Doe.

g. Compensation for any interim costs of education.

h. Nominal damages for the Constitutional violations.[20]

i. Attorneys' fees and costs. 42 U.S.C. §1988(b); 42 U.S.C. §1983.

j. A jury is demanded for all claims triable by jury.

Respectfully submitted,

/s Buddy B. Presley
Buddy B. Presley, Jr. (BPR #013921)
1384 Gunbarrel Rd, Suite A
Chattanooga, TN 37421
(423) 826-1800
bpresley@presleylawfirm.com

---

[19] A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. *Smith v. Wade*, 461 U.S. 30, 52 (1983) ("Compensatory damages … are mandatory.").

[20] *Carey v. Phiphus*, 435 U.S. 247, 266-67 (1978).

&

/s Justin S. Gilbert
Justin S. Gilbert
Gilbert Law, PLLC.
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423-756-8203
justin@schoolandworklaw.com

**CERTIFICATE OF SERVICE**

On March 25, 2025, I served the following Amended Complaint upon counsel of record, through the Court's ECF filing system, as follows:

Buddy B. Presley, Jr. (BPR #013921)
1384 Gunbarrel Rd, Suite A
Chattanooga, TN 37421
(423) 826-1800
bpresley@presleylawfirm.com

**CO-COUNSEL FOR PLAINTIFF**

DAN R. PILKINGTON, BPR No. 024660
ELISE M. DeNICOLA, BPR No. 042096
WATSON, ROACH, BATSON & LAUDERBACK, P.L.C.
1500 Riverview Tower
900 South Gay Street, P.O. Box 131
Knoxville, Tennessee 37901-0131
(865) 637-1700
dpilkington@watsonroach.com
edenicola@watsonroach.com

**DEFENSE COUNSEL**

/s Justin S. Gilbert