## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | |
|---|---|
| JOHN DOE., A MINOR, THROUGH HIS PARENT AND GUARDIAN, MARY DOE; AND MARY DOE, INDIVIDUALLY <br><br> PLAINTIFFS. <br><br> VS. <br><br> HAMILTON COUNTY DEPARTMENT OF EDUCATION, AND HAMILTON COUNTY (THE HAMILTON COUNTY SHERIFF'S DEPARTMENT) <br><br> DEFENDANT. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) No. 1:25-CV-0005 <br> ) CEA-CHS <br> ) JURY DEMANDED <br> ) <br> ) <br> ) <br> ) <br> ) |

---

# SECOND AMENDED COMPLAINT

---

**COMES NOW THE PLAINTIFF, JOHN DOE,** a minor, by and through his parent, Mary Doe, and Mary Doe, individually, and submits this Second Amended Complaint showing:

## I.        PARTIES, JURISDICTION, AND VENUE

1.      The Plaintiffs are John Doe who is a citizen and resident of Hamilton County, Tennessee, where he attends public school.  His case is brought through his natural parents, Mary Doe, and she makes claims for herself, individually.

2.      The Defendant, Hamilton County Department of Education (HCDE), is a county government school district, organized under the laws of the State of Tennessee, providing public education to students of Hamilton County.  It receives federal funds.

3. The Defendant, Hamilton County (the Hamilton County Sheriff's Department) is a governmental entity that provides school resource officers inside schools within HCDE. It receives federal funds.

4. This action arises out of the following federal statutes: Americans with Disabilities Act, 42 U.S.C. §12132 et. seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. §794; Section 1983 and the First Amendment to the United States Constitution; the Equal Protection Clause of the Fourteenth Amendment; and the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331.

5. Venue is appropriate in this Court under 28 U.S.C. §1391(b) as the cause of action arose in Hamilton County and the Defendant may be found in Hamilton County.

## II. INTRODUCTION

6. This case involves profoundly flawed policies and practices between the Hamilton County Department of Education (HCDE) and the Hamilton County's Sheriff's Office on the issue of speech inside schools, by a student with an intellectual disability talking about protecting his stuffed bunny, obviously *not* a threat of mass violence.

7. First, in non-exigent situations, HCDE's policy is to report all threats to law enforcement instead of reporting only *valid* threats determined by a threat assessment team.

8. Second, the Sheriff's Office refuses to permit its officers to act as threat assessment team members who receive confidential information, and act as school officials, to determine validity. They will instead act only as traditional law enforcement making arrests for probable cause. Thus, they are receiving confidential school information and using it to arrest students.

9.    Third, HCDE is left to perform the threat assessment *without* law enforcement. When HCDE finds there is no valid threat, or the student's disability excepts him from making a threat of mass violence, it is too late: the Sheriff has already arrested the student and charged him with a felony.

10.    Fourth, instead of returning the student to his regular school, HCDE defers to the Sheriff's wrongful acts and creates school-based discipline based upon the arrest. In short, the student with an intellectual disability, who never should have been referred, was instead referred, arrested, charged with a crime, and removed from his regular school.

## III.  FACTS

*John's Documented Disabilities*

5.    John is 13 years old,[1] but his maturity is significantly delayed due to medical impairments of Autism Spectrum Disorder and an Intellectual Disability. He has a "disability" under the ADA and Section 504, one that substantially limits one or more major life activities of such individual, 42 U.S.C.S. § 12102(1)(A), because John is substantially limited in thinking, communicating, understanding, learning, social interaction, and cognitive functioning.[2]

6.    John's substantial limitations were well-documented by HCDE. Months before, May 22, 2024, HCDE completed a psychological report for John through its school psychologist. His verbal comprehension is "extremely low range," the second percentile, and he is in the "very low range" of cognitive functioning. On the Comprehensive Test of Nonverbal Intelligence

---

[1]  At this time of this case.

[2]  Courts construe the term disability broadly. 42 U.S.C.S. § 12102(4)(A). As to the term "impairment," the applicable Department of Justice regulations provide that the term physical or mental impairment includes ADHD and dyslexia and other specific learning disabilities. 28 C.F.R. § 36.105(b)(2).

(CTONI-2), an intelligence test that measures one's cognitive and reasoning abilities, Doe received a full-scale IQ score of 68. And his academic skills, as measured by the Kaufman Test of Educational Achievement (KTEA), were less than 1% across all areas.

7.    Around that same time, May 23, 2024, HCDE completed a Speech and Language Evaluation. Teachers reported his poor language skills. Testing revealed his expressive language abilities as below average. In terms of socially appropriate speech ("pragmatics" or "social language"), his vocabulary is highly limited such that he could answer but a single question on the Social Language Test for Adolescents, resulting in a rank below the first percentile.

8.    John's disabilities also substantially impact his behaviors. HCDE documented, through a "Behavior Intervention Plan," that he sometimes makes "self-defeating comments" and "verbal threats toward others," resulting in a plan to mitigate these behaviors.

9.    In short, HCDE knew of, tested for, and documented, John's disabilities.

*John's Speech on August 8, 2024*

10.    This is "Bonnie the Bunny," a popular plush toy for kids:



11.    Although John was 13 years old, Bonnie remained John Doe's favorite toy.

12.    On August 8, 2024, the second day of school at Ooltewah Middle School, John carried Bonnie in his backpack, to his social studies class. Bonnie is precious to John. On this day, John said no one could look inside his backpack or else it would "blow up" the school.

13.     It would not *really* blow up, of course, because John's stuffed bunny does not explode, but John, due to his disabilities, believed he could protect Bonnie from others. So in his mind, and in his way, he spoke out.

14.     Asked for an explanation, John said, in writing: "I don't want nobody to look in my backpack because of my Bonnie plush."

15.     John's teacher, who heard his comment, understood that John is a student with a disability impacting his thinking and social interactions. HCDE staff opened John's backpack to find the stuffed bunny and nothing else of harm. It was—quite clearly—a false alarm, no *valid* threat whatsoever. That *should* have been the end of it. But it wasn't.

*Tennessee's Mass Violence Law Only Applies to "Valid" Threats*
*and Excludes Persons with an Intellectual Disability*

16.     Beginning in 2021, Tennessee made it a misdemeanor to threaten "Mass Violence on School Property."[3] A threat of "mass violence" is not just any threat. It is an act which "a reasonable person would conclude could lead to the serious bodily injury…or the death of two or more persons."[4]

17.     In 2023, the legislature required schools to expel students who threatened mass violence for a full calendar year.[5] Later still, in 2024, the legislature revised the expulsion requirement. Now schools must assess *whether* threats are "valid" before imposing any expulsion. Only students who make *valid* threats of mass violence, per the required threat assessment, may be expelled.[6] And, obviously, only *valid* threats are crimes.

---

[3] Tenn. Code Ann. § 39-16-517.
[4] *Id.* at 517(a)(1).
[5] Tenn. Code Ann. § 39-6-3401(g)
[6] *Id.*

18.     The legislature clarified principals' duties to report potential threats to law enforcement. Principals must report only *valid* threats of mass violence, as determined by the statutorily required threat assessment. As a result, jokes, hyperbole and other non-valid threats—not *true* threats—fall outside the mass violence law.

19.     Additionally, children with an intellectual disability, like John, are exempt from prosecution under the threat of mass violence law.[7]

20.     To be consistent with the First Amendment, only "valid" threats of mass violence must be reported to law enforcement, with "valid" being determined through a "threat assessment." Tenn. Code Ann. §49-6-4301(a)(3).

21.     Additionally, intentions matter under Tennessee's mass violence law. The speaker must "recklessly" threaten mass violence.[8] A student is "reckless" if they are aware of "a substantial and unjustifiable risk" that others may perceive their speech as a threat of mass violence, but they "consciously disregard" that risk.[9] This was not the case for John, nor was it possible for John.

22.     With those speech safeguards in place, for those students who *do* make valid threats of mass violence, the legislature elevated the crime to a felony.[8]

23.     Managing *valid* threats (non-protected speech) versus invalid threats (free speech) requires training.[9] And, importantly, it requires cooperation between the school district and law enforcement.  In this case, that cooperation is tragically lacking.

---

[7] Tenn. Code Ann. §39-16-517(b)(2).
[8] Tenn. Code Ann. § 39-16-517(b)(1).
[9] A publicly available memorandum dated July 24, 2023 from the Tennessee Department of Education's Office of General Counsel reminds school directors of the new law and instructs them to "work with their local attorneys to ensure policies, procedures, and . . . handbooks are

*HCDE and the County's Knee-Jerk Reactions to John's Speech*

24.     Instead of being trained for a situation like John's—obviously, no valid threat for a student who does not even fall within the mass violence statute—HCDE operated under a policy and practice whereby a student's intentions, valid or invalid, and a student's intellectual disability, do not matter.

25.     Under this policy and practice, HCDE requires that all threats, even invalid ones or ones occasioned by an intellectual disability, be referred *to law enforcement.*  That policy criminalizes the *words* themselves regardless of context, meaning, validity, or one's intellectual disability.

26.     HCDE highest leadership has advised all students and parents that threats of mass violence, "*regardless of intent or ability to carry out,*" must be charged as a felony.  That is wildly inaccurate, irresponsible, and serves to harm innocent children, particularly ones with intellectual disabilities like John.[10]

27.     Acting on this policy and practice, around 11:00 a.m., HCDE referred John and his statement to law enforcement, Officer Buckner, a School Resource Officer (SRO) with the Hamilton County Sheriff's Department.  At all times, HCDE knew John had a disability, knew his threat was not valid, and knew the backpack contained a stuffed bunny, but it operated under a belief that it must refer him anyway.

_____

revised to include this change in the law prior to the beginning of the 2023-24 school year." https://www.tn.gov/content/dam/tn/education/legal /Reminder_New_Zero_Tolerance _ Offense.pdf [perma: https://perma.cc/F2A2-99EJ]).

[10] Similarly, on September 6, 2024, the Community Schools Coordinator for Hamilton County Schools advised all students and families that assessment protocols are followed "without regard to … the actual intent of the student."  Again, this is wildly inaccurate and harmful.

28.     The County School Resource Officers (SROs) operated on severe misunderstandings of the threat of mass violence law too, as well as the First Amendment and disability laws protecting John.

29.     Around noon on August 8, 2024, SRO Buckner abruptly entered a school office where John was waiting. Buckner clearly knew, but it did not matter, that John had made no valid threat and he had an obviously apparent intellectual disability.

30.     Without performing a threat assessment, SRO Buckner entered and *immediately* told John: "Hey [ John], here's the deal. You're gonna have to come with me. You're gonna be charged with school threats, ok? Because you can't make comments about blowing up the school."

31.     And with that, without giving Miranda warnings, and knowing of his disability, Buckner wrongfully handcuffed Doe, wrongfully arrested him, and then put him in a police car and took him to the juvenile facility in spite of his obvious disability. Doe had committed no crime—he couldn't by statute—but Bucker arrested him anyway.

32.     SRO Bucker, too, was acting under a policy, custom and practice *required* by the Hamilton County Sheriff's Office to criminalize words regardless of context, and regardless of disability. Buckner himself had delivered a PowerPoint training to HCDE called "Threats of Mass Violence on School Property or at School Related Activity," under T.C.A. §39-16-517. He represents the policy and practice of the County Sheriff's office.

33.     In this training, Officer Buckner advised HCDE's faculty and staff that: "Any person who has knowledge of a threat of mass violence on school property or at a school-related activity and knowingly fails to report the threat commits a class B misdemeanor."

34.     In all caps, without distinguishing true threats, invalid threats, figurative speech, or speech occasioned by an intellectual disability, Bucker advised: "IT IS A VIOLATION OF THE LAW TO HAVE KNOWLEDGE OF A THREAT AND NOT REPORT." This surely put a chill on educators—misadvising them that all threats, with no exception for validity or intellectual disability, must be reported. This fairly represents the policy, attitude, and the training (and lack of training) of the Sheriff's office.

35.     In the training, Officer Buckner advised of the Sheriff's Office's "Policy Towards Threats of Mass Violence." He stated, again with emphasis, that: "It is the position of the Hamilton County Sheriff's Office and the Hamilton County District Attorney's Office that these threats will be taken seriously, and that offenders will be prosecuted!" This overbroad statement fairly represents the policy, attitude, and the training (and lack of training) of the Sheriff's office.

*The Shared Failures of HCDE and the Sheriff's Office*

36.     By the afternoon of August 8, 2024, together, HCDE and the County had harmed Doe through a shared lack of training. HCDE had determined—quite correctly and obviously—that Doe did *not* make a valid threat of mass violence and that his actions were occasioned by disability taking him outside the statute. But it had referred him to law enforcement without a threat assessment anyway. And the County's law enforcement had refused to participate in a threat assessment, or accept context, disability, or true threat in making the arrest.

37.     With Doe already arrested, that afternoon of August 8, 2024, HCDE decided to perform an after-the-fact threat assessment. Of course, it already *knew* that Doe was not a threat, and had a disability taking him outside the mass violence law, but it performed the threat assessment anyway.

38.    A threat assessment is used to distinguish invalid (sometimes called "transient") threats. Schools must adopt a policy to establish a threat assessment team to prevent violence and create a system for safe schools. Tenn. Code Ann. §49-6-2701(a). And that threat assessment team must include "law enforcement personnel." *Id.* at §49-6-2701(b).  In fact, it is the "local law enforcement or mental health service providers," here the Hamilton County Sheriff's Department, who must provide the threat assessment teams training "on how to assess individuals exhibiting threatening or disruptive behavior and develop interventions."[11]

39.    This threat assessment process, to determine validity, when performed correctly with law enforcement, is consistent with the First Amendment: Tennessee's requirement that a threat be "reckless" aligns with the Supreme Court's "true threat" jurisprudence.[12] Rejecting invalid threats—not *true* threats—protects jokes, satire, euphemism, hyperbole, sarcasm, and other ordinary adolescent snark from state suppression.[13]

---

[11] Tenn. Code Ann. §49-6-2701(c).

[12] *Counterman v. Colorado,* 600 U.S. 66, 69 (2023); see also *Newcomb v. Williamson Cnty. Sch. Bd. of Educ.*, 2024 U.S. Dist. LEXIS 212042, *33 (M.D. Tenn. 2024)(examining reckless standard of mass violence statute under *Counterman*).

[13] The "valid" requirement did not exist at the time of the *Newcomb* decision. *Newcomb*, at *12. Nor was *Newcomb* a First Amendment case. Even so, the decision notes that the Constitution protects non-serious speech:

> To start, it is not clear what the Board's position is regarding context, satire, or euphemism. For example, imagine that at a homecoming rally the football captain says "We're going to crush the Nashville Wildcats!" Under the Board's analysis, while the football captain may have been using "crush" euphemistically, and while this is not a serious threat, and "while the credibility of the threat may be called into question, it cannot be seriously disputed that [crushing an entire football team is an act that] a reasonable person would conclude could lead to serious bodily injury or death." (Doc. No. 37, at 3.) Moreover, the implausibility of an action—here, a middle school student killing all Mexicans—ought to affect the threat analysis. What if, for example, H.M. had threatened to cast a magical killing spell on a large group of people? What if H.M. had threatened to fly to the moon and shoot at people using

40.     But HCDE had a problem: the SRO *refused* to participate as a threat assessment team member who would receive confidential information about a child's disability. The Sheriff's office insisted upon acting solely in a traditional law enforcement capacity, using information it received *to arrest* John.

41.     The two roles of an SRO, threat assessment team member versus traditional policing, are quite distinct. When acting as part of a threat assessment team, law enforcement steps out of its criminal investigation role and steps into a unique threat analysis role. In that situation, state and federal law require law enforcement members of the threat assessment team to act as "school officials" to receive confidential, personally identifiable student information. *Id.* at §49-6-2701(d) (citing FERPA, 20 U.S.C. §1232g and Tenn. Code Ann. §10-7-504). The law enforcement member of the threat assessment team cannot disclose any information they receive about students for any other purpose. Tenn. Code Ann. § 49-6-2702(a)(2).[14]

42.     A July 22, 2024 Memorandum of Understanding (MOU) between HCDE and the Sheriff's Office attempted to explain the role of the SRO. But it is hopelessly muddled. The "purpose" of the MOU is to establish "obligations" between the school district and the county

_____

a space laser? The court agrees that killing every Mexican would involve death to at least two people, but any serious argument on this topic needs to consider the threatened action's plausibility.

*Newcomb v. Williamson Cnty. Sch. Bd. of Educ.*, 2024 U.S. Dist. LEXIS 212042, *32-33 (M.D. Tenn. 2024)

[14] Similarly, the Constitutional standard changes when law enforcement acts as a "school official" participating in an interrogation on campus. As a school official who is retaining order, reasonable suspicion is the standard for an SRO's search or seizure, and no Miranda warnings are necessary before an interrogation. But when an SRO acts in a traditional law enforcement role, probable cause and Miranda warnings are required. *R.D.S. v. State*, 245 S.W.3d 356 (Tenn. 2008). See also *People v. Dilworth,* 661 N.E.2d 310, 317 (Ill. 1996).

sheriff's department. (*Id.* at "I."). Generally, this MOU separates school discipline decisions from law enforcement arrests, with school discipline being the province of the school district and arrests being the province of law enforcement. (*Id.* at "III," "IV."). The two are said to be independent contractors. (*Id.* at "XVIII, at I.").

43.     But there is overlapping responsibility too. On the subject of "Training for an SRO and School Personnel," the MOU states in relevant part: "Planning and training for emergencies and school safety should be conducted *collaboratively* by SROs and school personnel. Both should take an active role in training school personnel regarding emergency management issues." (*Id.* at "VI.") (emphasis added). An "open exchange" of information is required between the two. (*Id.* at "VII.").

44.     Importantly, *when conducting interviews of juveniles*, like Buckner would do of John, the MOU blurs the distinct roles together, requiring they be conducted not only in conformance with sheriff's department rules but also the school district's policies and "all applicable laws." (*Id.* at "IX. C.").

45.     Against this backdrop, realizing SRO Bucker was operating *independently*, not as a threat assessment team member concerned with Doe's disability, context, or validity, HCDE performed the threat assessment without law enforcement.[15]

46.     In the belated threat assessment, HCDE documented that John had no intention of hurting himself or anyone else. HCDE also documented there were no targets, no indications of suicide, nor aggressive or violent ideation, no weapons, no unusual interest in violence, no previous attacks, no weaponry, no anti-social characters, and no gangs.

---

[15] It was completed by assistant principal Japho Hardin and school counselor Whitney Ballard.

47.     HCDE further documented there was no motive, goal or justification for any aggressive behavior. HCDE documented there were no indications of hopelessness, or stressfully overwhelming or desperate situations. Rather, John "brought the stuffed animal because that day was the anniversary of [a movie involving the character], and he didn't want anyone to go through the bag."

48.     HCDE also documented there were no indications of a capacity or ability to plan and carry out an act of targeted violence. HCDE also documented that John's statement featured "a mental health disorder… ('a disability')" and "[t]he student currently has an IEP."

49.     HCDE also documented how "the student's actions are not consistent with [his] communications." HCDE documented that John did not present a threat of aggression.

50.     And, even in this lawsuit, HCDE admits John Doe never made any threat of mass violence.[16] Moreover, HCDE found the statement *was* connected to his disability.

*Removal from School*

51.     Instead of returning John to his regular classroom for an invalid threat, one occasioned by disability, HCDE violated Tenn. Code Ann. §49-6-3401(g), the First Amendment, the Americans with Disabilities Act and Section 504, by forcing him out of school.[17] Forced home, Doe could not attend in-person school or any extracurricular activities or be on school grounds.

---

[16]  HCDE's Answer to Interrogatories 5, 7, 9.

[17]  HCDE would offer a return to school ten days later, on or about August 19, 2024—but by this time, Plaintiff sought a transfer to escape administration and SRO Buckner.

*Failed Procedures Get Confirmed*

52.     On August 14, 2024, the principal, Andrea Short, confirmed the fatal flaws in HCDE's and the County's procedures. First, she misadvised John's mother that, "We are required to notify law enforcement (we have an SRO on campus)."[18]

53.     Then, admitting that SRO Buckner refused to operate as a threat assessment team member due to a conflicting role and assessment measures with the County, Ms. Short explained: "Law enforcement does not utilize our threat assessment levels."

54.     And even though Doe was *not* making a valid threat, and falls outside the threat assessment law due to intellectual disability, Ms. Short conceded that HCDE can *change* the discipline "if charges are filed."

55.     In sum, the responsibility for John's arrest and removal from school is shared. HCDE was responsible for prematurely referring John for an obviously invalid threat; for not having a threat assessment team member as a school official to timely rule out the invalid threat; and for failing to return John to his regular classroom. The County, too, is responsible for refusing to participate as a threat assessment team member to determine a valid threat or no possible threat due to his disability; and for wrongfully arresting a student with a disability with an intellectual disability.

56.     In the end, John was arrested and charged with a felony of mass violence, and removed from his regular education class for what everyone understood was a statement by a student with a disability about protecting his stuffed toy bunny from others. HCDE effectively

---

[18] This is not accurate. Only *valid* threats must be reported to law enforcement because invalid threats, including those by a child with an intellectual disability, are not crimes.

made a false report of non-threatening speech by a person with a disability who is not even subject to the statute. And law enforcement arrested and charged him with a felony. HCDE then kept Doe out of school and school property.

57.     HCDE's and the County's systems are profoundly flawed. Together they create the likelihood, if not certainty, that innocent children, including ones with disabilities like Doe, are arrested and charged with a felony for invalid threats (transient ones) or, as in this case, statements made by a person with a disability. And once the criminal charges *are* filed , HCDE goes back and removes the student from school based upon the "pending legal charges" that its own flawed practice created in the first place. Discriminatory school discipline results from the discriminatory referral and discriminatory arrest.

58.     John Doe and Mary Doe have suffered substantial emotional harm from HCDE's and the County's conscious-shocking, discriminatory failure to follow the law by distinguishing true or valid threats from transient or non-threats. John has suffered the unnecessary trauma of an arrest he could not understand. He's suffered unnecessary fear and trauma, and his reputation was stained by an alleged act of mass violence that was, in fact, anything but.

## IV.   LEGAL CLAIMS

### Count 1: The Americans with Disabilities Act
### (HCDE and County Sheriff's Department)

59.     "In the ADA, Congress provided [a] broad mandate" to "effectuate its sweeping purpose[ to] ... forbid[] discrimination against disabled individuals in major areas of public life,[including] ... public services ...." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). It is "a milestone on the path to a more decent, tolerant, progressive society." *Id.* (quoting *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring))

60. The ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130.

61. Title II of the ADA applies to all of the activities of public entities, including school districts that provide public education.

62. Likewise, Title II of the ADA applies to law enforcement—a public entity—and law enforcement activities such as arrests.

63. John Doe is a qualified individual with a disability;[19] the Defendant is subject to the ADA; and he was denied the opportunity to participate in or benefit from the Defendant's services, programs, or activities, or was otherwise discriminated against by the defendants because of his disability, or through reasonable modifications to avoid said discrimination.

64. The regulations implementing Title II of the ADA state that [a] public entity, in providing any aid, benefit, or service, may not, *directly* or through *contractual, licensing, or other arrangements*, on the basis of disability . . . (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; (iii) Provide a qualified individual with a disability

---

[19] More specifically, the implementing regulations to ADA define an individual with a disability as follows: "(a)(1) Disability means, with respect to an individual: (i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (ii) A record of such an impairment; or (iii) Being regarded as having such an impairment . . . ." *Id.* § 35.108. Doe meets this criteria due to his Autism Spectrum Disorder and/or Intellectual Disability.

with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others; . . . [or] (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. *Id.* § 35.130(b)(1)(i), (ii), (iii), (iv), (vii).

65.     Further, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State." *Id.* § 35.130(b)(3).

66.     Thus, the regulations implementing Title II of the ADA require that public entities avoid unnecessary policies, practices, criteria or methods of administration that have the effect or tendency of excluding or discriminating against individuals with disabilities. *Id.* §§ 35.130(b)(3), (8).

67.     Further, Title II regulations require public entities to "make reasonable modifications" to their programs and services "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7)(i). In this case, this requires policy exclusions or

modifications for behaviors that are a manifestation of disability, or adopting a policy to support a student's behavioral needs. And it also requires, as here again, making modifications to policies or practices involving interactions between students with disabilities and the SROs/law enforcement personnel who operate inside the schools.

68.     Together, Defendant HCDE and the County are using their relationship to criminalize words of a student with an intellectual disability and autism, regardless of intentions, regardless of intellectual disability, and together, effectuating wrongful arrests and exclusion from school property.

69.     Together, Defendant HCDE and the County engaged in intentional discrimination through gross misjudgment, and also failed to reasonably modify its policies and practices for John Doe's disability, to account for his intellectual disability which exempts him from arrest for making a "threat of mass violence," and for removal from school.

## Count 2. Section 504 of the Rehabilitation Act
## (HCDE and County Sheriff's Department)

70.     As with the ADA, HCDE and the County are criminalizing non-threatening speech of a student with a disability—who is not even subject to the mass violence statute.

71.     Section 504 is a federal law that protects individuals with disabilities in programs and activities that receive federal financial assistance. 29 U.S.C. § 794; 34 C.F.R. §§ 104.1, .4. Specifically, Section 504 states that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . " 29 U.S.C. § 794(a). Thus, Section 504 applies to all school districts and law enforcement entities that receive federal financial assistance. *Id.* §

794(b)(2); 34 C.F.R. § 104.31. Section 504, too, requires provision of reasonable modifications. 29 U.S.C. 794(a); 28 C.F.R. §41.53.  This covers both Defendants.

72.    A student with a disability satisfies the definition of a "qualified handicapped person" if the student "(i) has a physical or mental impairment which substantially limits one or more major life activities [such as thinking or learning], (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 34 C.F.R. § 104.3(j).  Again, Doe meets this criteria due to his Autism Spectrum Disorder and/or Intellectual Disability.

73.    Doe is a qualified individual with a disability; the Defendant is subject to the ADA or the Rehabilitation Act; and he was denied the opportunity to participate in or benefit from the Defendant's services, programs, or activities, or was otherwise discriminated against by the defendants because of his disability, or though reasonable modifications to avoid said discrimination.

74.    For matters of discipline, schools must avoid discrimination based upon one's disability.  This obligation extends to school-based referrals to law enforcement. Thus, schools must make reasonable modifications to their criteria, policies, practices or procedures when necessary to avoid discrimination on the basis of disability. 34 C.F.R. § 104.4 (Section 504 regulation prohibiting disability discrimination). Of course, school policy must also avoid discriminatory different treatment and/or disparate treatment in the first place.

75.    In this case, Section 504 compliance requires HCDE and the County to distinguish transient or non-threats from true threats of mass violence when assessing the potentially threatening speech of students with disabilities. This requires policy exclusions or modifications for behaviors that are a manifestation of disability, or adopting a policy to support a student's

behavioral needs. And it also requires, as here again, making modifications to policies or practices involving interactions between students with disabilities and the contracted SROs/law enforcement personnel who operate inside the schools. See 34 C.F.R. § 104.4 (1),(4); see 28 C.F.R. § 35.130(b)(3),(7).

76. Defendants engaged in intentional discrimination through gross misjudgment, and also failed to reasonably modify its policies and practices for John Doe's disability to account for his intellectual disability which exempts him from arrest for making a "threat of mass violence," and for removal from school.

### Count 3. Section 1983 and First Amendment
### (HCDE and County Sheriff's Department)

77. HCDE and the County Sheriff are deciding that *speech*—here the statement of a young boy with a disability protecting his stuffed toy bunny—is *not* a true threat (or any threat), but it is criminalizing that speech anyway.

78. The First Amendment protects the right to free expression. A key exception concerns "*true threats*" of violence. "[T]he 'true' in that term distinguishes [true threats] from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late.')."[20] Doe's speech was exactly that kind of hyperbole to protect his stuffed bunny. His speech was not a "true" threat.

79. Nor did Doe's speech "*substantially and materially disrupt*" the learning environment.[21] And he was not indecent, lewd, or vulgar with his speech. Doe's teacher continued

---

[20] *Watts v. United States*, 394 U.S. 705, 708 (1969) in *Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

[21] *Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503 (1969).

teaching. There was no evacuation, no instructional breaks, no material and substantial disruption. In fact, the threat assessment cleared Doe of making any threat of mass violence.

80.     For *not* making a valid threat of mass violence, the school district and the County treated him as if he had. Without training on correct procedure with a correct model, the school district and the County will continue violating students' rights under the First Amendment (retaliation for speech), using policies and procedures under color of law that violated the United States Constitution.

81.     HCDE's decision to report Doe to law enforcement under these circumstances and, then, remove him from school property violates the First Amendment.  Additionally, under Section 1983, HCDE was deliberately indifferent by failing to train its decision-makers about not reporting as a crime what was obviously *not* a true threat.  This caused Doe both educational and emotional harm.

82.     Similarly, the County Sheriff's decision to harshly penalize Doe for his use of words—a felony charge—is a deliberate choice arising from its policies and procedures, including the lack of training, violating the First Amendment.

83.     Defendants, under color of state law, infringed on Doe's First Amendment rights and did so with deliberate indifference.

### Count 4. Equal Protection
### (HCDE and County Sheriff's Department)

84.     Section 1983 provides a cause of action for an individual whose constitutional or federal rights are violated by those acting under color of state law:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

85.     John Doe is a United States citizen with rights under Section 1983. "The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011).

86.     The clause is "essentially a direction that all persons similarly situated should be treated alike." *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012)(quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985)).

87.     HCDE treated Doe differently *because of* a disability.  His thoughts, language, and expressions were disability linked—"manifested" as HCDE would find—but instead of relieving him of a report prosecution, HCDE reported him anyway, and the County then charged him with a felony.  HCDE's and the County's training programs on threats of mass violence, and on threat assessments, is inadequate for the tasks required. They acted arbitrarily, irrationally, and unconstitutionally.

**Count 5. Section 1983 and Fourteenth Amendment Substantive Due Process.
(HCDE)**

88.     Defendant HCDE deprived Doe of a liberty or property interest,[22] under color of law, in a conscious-shocking manner by removing him for stating that his backpack could blow up.

---

[22]  Tennessee students enjoy a property interest in education.

Defendant clearly knew this was *not* a valid threat of mass violence but treated it as so anyway—reporting him for a crime notwithstanding how it knew he made no valid threat (and was not even subject to the law).

89.     Defendant HCDE violated DOE's substantive due process rights by removing him from school based upon a criminal charge *that it created*. It acted arbitrarily, irrationally, and unconstitutionally.

For relief, Plaintiffs seek:

a.  Declaratory relief of the Constitutional violations.

b.  Injunctive relief to include training related to the correct application of Tennessee's mass violence law, including training on threat assessments to distinguish transient threats and threats by students with disabilities, to avoid violation of disability laws, First Amendment, and the Constitution.

c.  Injunctive relief enjoining Defendants from using protocols to report Doe for a crime for disability-manifested speech or for a crime of mass violence for speech that is *not* a valid threat of mass violence.

d.  Reasonable modifications of Defendants' policies, procedures, and practices to account for intellectual disability, including not reporting transient or invalid threats as potential crimes and not arresting a student with an obvious intellectual disability. This also includes creating valid procedures for threat assessment teams and the complementary use of SROs/law enforcement personnel who operate inside the schools.

e.   Compensation for humiliation, mental anguish, and damage to Doe's reputation.[23]

f.   Compensation for humiliation and mental anguish to Mary Doe.

g.   Nominal damages for the Constitutional violations.[24]

h.   Attorneys' fees and costs. 42 U.S.C. §1988(b); 42 U.S.C. §1983.

i.   A jury is demanded for all claims triable by jury.

Respectfully submitted,

/s Justin S. Gilbert
Justin S. Gilbert
Gilbert Law, PLLC.
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423-756-8203
justin@schoolandworklaw.com

/s Buddy B. Presley
Buddy B. Presley, Jr. (BPR #013921)
1384 Gunbarrel Rd, Suite A
Chattanooga, TN 37421
(423) 826-1800
bpresley@presleylawfirm.com

## CERTIFICATE OF SERVICE

On August 6, 2025, I served the following Second Amended Complaint upon counsel of record, through the Court's ECF filing system, as follows:

Buddy B. Presley, Jr. (BPR #013921)
1384 Gunbarrel Rd, Suite A
Chattanooga, TN 37421
(423) 826-1800

---

[23] A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. §1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. *Smith v. Wade*, 461 U.S. 30, 52 (1983) ("Compensatory damages … are mandatory.").

[24] *Carey v. Phiphus*, 435 U.S. 247, 266-67 (1978).

bpresley@presleylawfirm.com

**CO-COUNSEL FOR PLAINTIFF**

DAN R. PILKINGTON, BPR No. 024660
ELISE M. DeNICOLA, BPR No. 042096
WATSON, ROACH, BATSON & LAUDERBACK, P.L.C.
1500 Riverview Tower
900 South Gay Street, P.O. Box 131
Knoxville, Tennessee 37901-0131
(865) 637-1700
dpilkington@watsonroach.com
edenicola@watsonroach.com

**DEFENSE COUNSEL**

/s Justin S. Gilbert