## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

JOHN DOE, a Minor,  )
THROUGH HIS PARENT  )
AND GUARDIAN,  )
MARY DOE; and MARY DOE, INDIVIDUALLY  )
                                      )
    Plaintiffs,  )
                                       )  No. 1:25-CV-0005
v.  )  CEA-CHS
                                       )  JURY DEMANDED
                                       )
HAMILTON COUNTY DEPARTMENT  )
OF EDUCATION, and  )
HAMILTON COUNTY (THE HAMILTON  )
COUNTY SHERIFF'S DEPARTMENT)  )
                                       )
    Defendants.  )

---

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT HAMILTON COUNTY

---

**COMES NOW** the Plaintiff, John Doe, a minor, by and through his parent and guardian, Mary Doe, and Mary Doe, individually (collectively "Plaintiff" or "Doe"), and respectfully moves, pursuant to Fed. R. Civ. P. 56, for partial summary judgment on liability against Defendant Hamilton County (the Hamilton County Sheriff's Department) (the "County") on Count 3 of the Second Amended Complaint – the Section 1983 First Amendment claim. (D.E. 27, Second Am. Compl. ¶¶77–83). This motion is directed solely at the County; it does not seek judgment against Defendant Hamilton County Department of Education ("HCDE").

### I. INTRODUCTION

This case presents the constitutional defect of a County policy requiring school-arrests for *words alone*, regardless of known context, regardless of validity, and regardless of the officer's knowledge of autism and belief that he "doesn't need to be [detained]."

On August 8, 2024, School Resource Officer Jason Buckner personally opened John Doe's backpack alongside school administration and saw that it contained nothing but a toy stuffed bunny. (Ex. 1, Buckner Dep. 43:1–13). He had already been told John Doe had an IEP. (Ex. 4, Hardin Dep. 31:12–17; Ex. 1, Buckner Dep. 24:18–25:1). He also had, in hand, Doe's own written explanation for his statement—that he did not want anyone in his backpack "because of my bonnie plush." (Ex. 3, Doe Statement; Ex. 1, Buckner Dep. 49:1–12).

Buckner asked no further questions about the nature of Doe's disability, sought no additional information from the school, and proceeded to handcuff and arrest a thirteen-year-old child without *Miranda* warnings. This was *not* because Buckner believed a real threat existed (he *didn't believe that*), but because, in his own sworn admission, a student must go "to jail …. because he said the magic words." (Ex. 1, Buckner Dep. 52:24–53:2).

Minutes later, on his own bodycam, recorded contemporaneously with the arrest, Buckner is heard describing Doe as "slightly on the autistic scale," explaining that Doe "was embarrassed with a plushy in his backpack," and, in the same breath, that "honestly, he doesn't need to be up here," but "by the law, I gotta do it." (Ex. 7, Bodycam, at 1:06–1:07).

This "change in the law," was *not* a change in the *mens rea*. It remained a reckless standard from 2021. The "law change" was a July 1, 2024 amendment making reckless threats a *felony,* no longer a misdemeanor. Tenn. Code Ann. §39-16-517. But the County equated an increased penalty to increased charging—now on words alone, not exculpatory context, as required by the First Amendment in *Counterman v. Colorado*, 600 U.S. 66, 74 (2023), and Tennessee's mass violence law at Tenn. Code Ann. § 39-16-517(b)(2).

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to this Court's practice preferences, the following material facts are set forth within this memorandum, supported by specific citations to the record, rather than as a separately filed statement of undisputed material facts.

1. On August 8, 2024, the County's Student Resources Officer, Jason Buckner, and the School District's assistant principal, Japho Hardin, opened John Doe's backpack at school to find a stuffed bunny inside. (Ex. 1, Buckner Dep., p. 43, ll. 1-13). A teacher, Mr. Winder, had informed SRO Buckner that Doe had made a threat; SRO Buckner asked for a statement; and Mr. Winder wrote that Doe said: "You won't believe what's in here. If you check, it will blow up the whole school." (*Id*. at Bucker Dep., pp. 13-14; Ex. 2 (Winder Statement)).

2. *Before* arresting him, SRO Buckner obtained a written statement from Doe about his statement; Doe wrote: "i don't want nobody to look in my backpack because of my bonnie plush."[1] (Ex. 3, Doe Statement; Ex. 1, Buckner, pp. 48-49).

3. *Before* arresting him, the school district told SRO Buckner that Doe had an Individual Education Plan (IEP). (Ex. 1, Buckner Dep. 24:4–14). In his deposition, Buckner said he received no information *about* Doe's disability, (*Id.* at 26: 3-9; 63:20-24; 64: 24-25), and he never sat on the threat assessment team with school officials to discuss it, acting "independently" from them. (*Id.* at pp. 17, 19-20, 37, 48-49).

4. Without asking Doe a single question, Deputy Buckner entered the office where Doe waited and announced: "Hey [John], here's the deal. You're gonna have to come with me. You're gonna be charged with school threats, ok? Because you can't make comments about blowing up the school." (Ex. 1, Buckner Dep. 42:3–8; Ex. 7, Bodycam video, 00:32-44)).[2]

---

[1] A "bonnie plush" is a plushy toy, a stuffed bunny.
[2] The bodycam video is being manually filed, a copy previously provided to all counsel.

Buckner then handcuffed Doe, arrested him, and transported him to the juvenile detention facility without providing *Miranda* warnings. (Ex. 1, Buckner Dep. 45:3–19).

5. At the juvenile facility, with Buckner's bodycam still recording, Buckner discusses Doe's arrest with another member of law enforcement, stating this occurred on "day two of school," that Doe "is slightly on the autistic scale," that Doe "made a threat," that "with the law change, I gotta do it," and in the same breath that, "honestly, he doesn't need to be up here," but Doe "was embarrassed with a plushy in his backpack" and "was embarrassed because he did not want anyone to see it," concluding again, "but by the law, I gotta do it." (Ex. 7, Bodycam, at 1:06–1:07).

6. Buckner was trained to use a "words only" standard, removed as he was by County operations from the multi-disciplinary threat assessment team and even his own disbelief in the detention. He agreed that, even with an intellectual disability (a rule-out for arrest): "He would have went to jail… because he said the **magic words**, so to speak." (Ex. 1, Buckner Dep. 52:24, 53:2). Buckner used his same County protocol that he used on ten prior occasions; context does not matter if a word is said. (*Id*. at 24: 22, 27: 7-14, 15-20; 28:7–20)

7. The County has never provided Buckner any training about how context *does* matter for a true threat. As he admits, even though he is a School Resource Officer who provides school wide training *to all students*, he himself has received no training about how the First Amendment applies to schools; and he has never heard of the "True Threat" requirement. (Ex. 1, Buckner Dep. 65:16–24).

8. Hamilton County's threat assessment team, which requires participation of law enforcement, but upon which SRO Buckner *refused* to participate, found no apparent intent, no evidence of motive, no ability to carry out any threat, no weapons, no accomplices, and rated the

4

overall threat level "low," the lowest rating available on the scale. (Ex. 6, Threat Assessment Reporting Form (Intent: "Not Apparent"; Motive: "No Evidence of Motive Exists"; Ability to carry out threat: "None"; Involved Weapons: "None"; accomplices: "No"; Determination of overall threat level: "Low Level"); Ex. 4, Hardin Dep. 17:11–19:22; Ex. 5, Short Dep. 26:18–20). Having refused to participate, Buckner never knew it. (Ex. 1, Buckner, p. 49-50).

9.      Hamilton Count's Manifestation Determination Review team found that Doe's statement was a *manifestation* of his disability too. (Ex. 4, Hardin Dep. 23:8–18; accord, Ex. 5, Short Dep. 41:10–13 (agreeing that "the manifestation team determined that the threat was a manifestation of his disability")).

### III.  ARGUMENT

**A.      Doe's Statement Was Protected Speech, Not a "True Threat."**

Public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The government may suppress student "threats" under the First Amendment under the "true threats" of violence doctrine. *Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

A *true* threat is a "serious expression" conveying intent to commit an act of unlawful violence; the word "true" exists precisely to "distinguish[] [true threats] from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Id*. Both *Counterman* and Tennessee's corresponding statute require, at minimum, a "reckless" mental state on the part of the speaker. *Id*.; Tenn. Code Ann. § 39-16-517.

The undisputed facts here negate a true threat on every measure *Counterman* identifies. Doe's in-class statement—that "the whole school will blow up"—was made in response to his

teacher's question about why he did not want him to look in his backpack containing the toy stuffed bunny. (Fact ¶1, supra).

At least four facts negate the reckless mental state a true-threat charge of mass violence would require. First, Buckner personally opened the backpack and saw for himself that it held nothing but a stuffed bunny—no weapon, no device, no means of carrying out any threat of any kind. (Facts, ¶1, supra). Second, he already held, in his own hand, Doe's own written explanation that the backpack contained his plushy toy. (Facts, ¶2, supra). Third, he did *tell* John it was the words alone: "Hey [John], here's the deal. You're gonna have to come with me. You're gonna be charged with school threats, ok? Because you can't make comments about blowing up the school." (Facts, ¶4, supra). Fourth, Buckner's own statement discounting his *own* belief that Doe, with his autism, "doesn't need to be up here," but he was acting upon the County's procedures required of him: "with the law change, I gotta do it." (Facts, ¶5, supra).[3]

*Counterman* requires at least *recklessness* as to whether a statement would be understood as a serious expression of intent to commit violence – a mental state judged by what the speaker disregarded, not by what an officer later decides to charge. 600 U.S. at 79. Doe clearly had no bombing intention.[4] But the SRO's understanding is relevant too. An officer who has physically confirmed that a child's backpack contains no weapon, and who already holds that child's own written explanation for the statement about a plushy toy, and knows the student has autism does not leave an objectively reasonable basis to believe Doe communicated a *true* threat.

---

[3] The law did *not* change the mental state. It increased the penalty to a felony, meaning SRO Buckner apparently thought the increased penalty required him to dispense with recklessness and charge regardless.

[4] Doe is not "slightly" on the autism scale. His disability is such that, upon *in camera* hearing with Judge Stegall, he is not even capable of testifying. (D.E. 44, Order) (citing a full scale IQ of 68).

Buckner's own bodycam, recorded minutes later during booking, removes any remaining doubt that this was ever a genuine threat: describing Doe as slightly autistic, Buckner is heard reaching that same conclusion himself, unprompted, that "honestly, he doesn't need to be up here." (Facts ¶5, supra). The stuffed bunny already in Buckner's hands before he ever decided to arrest, and the disability for which he had context of an IEP and autism, tell the same story: there was no *true* threat here, at any point in this encounter.

### B. The County Is Liable Under *Monell.*

A municipality may be held liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), under any of four recognized theories: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 323 (6th Cir. 2023). The undisputed record satisfies at least the first and third of these theories, and supports the fourth as well.

Municipal liability does not arise merely because *Deputy Buckner* violated the Constitution. It arises because the undisputed evidence demonstrates that Buckner acted consistently with Hamilton County's official policy and instruction of him, longstanding enforcement practices, and constitutionally deficient training. Buckner's sworn testimony, and Buckner's contemporaneous body-camera statements, all establish that Doe's arrest resulted from misdirected County policy rather than Buckner's individual mistake.

**1.** **Hamilton County Maintained an <u>Official Policy</u> That Treated Certain Words as Sufficient to Require Arrest Without the Constitutional Inquiry Required by the First Amendment.**

A *Monell* policy need not be written; it is enough that it is "made by…lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988). Here the policy is not inferred–it is admitted.

As explained further below (in training section), Deputy Buckner confirmed that he received *no training* concerning the First Amendment in school or the true-threat doctrine and had never heard of the constitutional distinction between protected speech and a true threat. The result was predictable: Using the County protocols he always used, Doe "would have went to jail because he said the magic words." (Facts ¶6, supra). That would be the case even for an intellectual disability—which is excluded under Tenn. Code Ann. §39-16-517(b)(2). (*Id*.)  Context does not matter if the trigger word is uttered.

A standing, operational rule that is consistently applied and confirmed on the record by the officer who enforces it is an official policy within the meaning of *Monell*, whether or not it is captured in a written directive separate from the training materials already in the record. *Praprotnik*, 485 U.S. at 121; *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986) (a single application of an identified policy suffices; no pattern evidence is required where, as here, the policy is directly ascertainable).

In sum, the County affirmatively instructed its officers that uttering certain *words* triggers arrest, while ignoring the constitutional limitations that determine whether an arrest is actually lawful.

## 2. The Sheriff's Office's <u>Operating Procedures</u> Precluded Contextual Evaluation

Tennessee law requires that a school's threat assessment team include "law enforcement personnel," Tenn. Code Ann. § 49-6-2701(b), who must act as "school officials" authorized to receive confidential, personally identifiable student information for the limited purpose of assessing *validity* – not to use that information for a separate law-enforcement purpose. *Id*. § 49-6-2701(d); 20 U.S.C. § 1232g; Tenn. Code Ann. § 49-6-2702(a)(2).

But the Sheriff's office excludes its SROs from that role. (Fact ¶3, supra). Buckner was made to be "independent" of the threat assessment team. (*Id*.) This is true even though both law enforcement and the threat assessment team (consisting of law enforcement) are both engaged in determining the genuineness of a threat.

With the County removing SROs from the multi-disciplinary threat assessment teams, they are removed from critical disability-related evidence about the child's functioning, evidence bearing on whether the child actually *poses* a threat. SROs, due to County policies, is left with scary words (like "bomb in a backpack").

Whether speech constitutes a "true threat" cannot be determined by the reported words in isolation; it requires consideration of context, surrounding circumstances, and the speaker's mental state. That contextual inquiry is gained through educational documents and discussion with educators about the disability. The County's operational policy of making arrest decisions *outside* of that process for students with disabilities creates a "words alone" problem whereby the SRO is arresting kids like Doe who he intuitively knows "doesn't need to be [detained]." But he has been blinded to context by not participating in the very process *designed* for context. Even for the probable cause analysis, a police officer must consider the "totality of the circumstances," not just evidence of guilty while ignoring *exculpatory* evidence. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020)

**3. Alternatively, the County Maintained a <u>Custom</u> of Arresting Students Without the Constitutionally Required Contextual Inquiry.**

The same testimony supports municipal liability under a third independent theory. To prevail on a custom-of-tolerance theory, a plaintiff must show "prior instances of unconstitutional conduct demonstrating that the [municipality] ha[d] ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess v. Fischer*, 735 F.3d 462, 478 (2013)

The practice at issue here–arresting based on words alone *is* the protocol; Buckner has followed that same protocol in "more than ten" prior threat-of-mass-violence investigations. (Fact, ¶6, supra). His supervisors–first Lieutenant Durham, then Sergeant Merritt–receive a bare report each time, context mattering not. (*Id*.)

A practice repeated in every mass-violence case an SRO has handled, reported up the chain of command every time, and never corrected or supplemented by the supervisors receiving those reports, is a clear and persistent pattern known to the County's own supervisory chain. That silence is acquiescence, and the custom operated in this case exactly as it was designed to: Buckner arrested based on words even if he disagreed with it, it did not matter that he had an IEP, or Autism, so he followed protocols and arrested Doe anyway. (Fact ¶4, supra).

**4. Alternatively, the County Is Liable for Deliberate Indifference in <u>Training</u>.**

The County additionally maintains a policy of inadequate training. Buckner–the Sheriff's Office's own designated trainer on threats of mass violence–has *never* been trained on how the First Amendment applies in schools, has never heard of the "True Threat Doctrine," and has never heard of *Counterman*, the controlling Supreme Court authority on the very subject he was tasked with teaching to HCDE staff and students district-wide. (Facts ¶7, supra).

10

Where, as here, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the failure to train reflects deliberate indifference, *Monell* liability attaches. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). An SRO tasked with enforcing a criminal statute against schoolchildren, who has never heard of the controlling constitutional doctrine governing that very enforcement, and who was the department's own trainer on the subject, is the paradigm case. That is deliberate indifference, even if not "maliciousness."

Asked what he does once told a student has an IEP, Buckner testified he simply "let[s] my supervisor know," along with the student's name, grade, and the incident – nothing more about the disability itself. (Facts, ¶6, supra). Asked directly whether he inquired further, Buckner confirmed he did not ask, and was not asked by his supervisor, what kind of disability was involved, whether it was an intellectual disability, or for any supporting educational records. (*Id*.) And this was not improvisation particular to Doe's case: it is, in Buckner's own words, "the standard protocol that you always follow," applied in "more than ten" prior mass-violence investigations without variation. (*Id*.).

An officer who has been taught to ask one question – does the student have an IEP – and stop there, and exclude himself from a multidisciplinary team, has not been trained to apply the individualized, reckless-mental-state analysis *Counterman* requires, nor even to ask basic follow-up questions about the impact of a student's disability. He has been trained *not* to, arresting on words alone.

## IV. CONCLUSION

The undisputed facts establish, as a matter of law, that the Hamilton County Sheriff's Department maintains and enforces a policy under which words alone–regardless of validity, intent, or the speaker's disability–trigger arrest.

John Doe's statement was protected speech, not a true threat; he was arrested anyway, in handcuffs, without *Miranda* warnings, based on a backpack search that had already revealed nothing more than a stuffed bunny. Plaintiff respectfully requests that the Court grant partial summary judgment on liability in Plaintiff's favor and against Defendant Hamilton County on Count 3 of the Second Amended Complaint.

Respectfully submitted,

/s Justin S. Gilbert
Justin S. Gilbert
Gilbert Law, PLLC.
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423-756-8203
justin@schoolandworklaw.com

/s Buddy B. Presley
Buddy B. Presley, Jr. (BPR #013921)
1384 Gunbarrel Rd, Suite A
Chattanooga, TN 37421
(423) 826-1800
bpresley@presleylawfirm.com

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing has been filed with the Court through its ECF filing database and served on all counsel of record on this date of July 17, 2026, via the Court's electronic filing system.

/s Justin S. Gilbert