IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

------------------------------------------------------

JOHN DOE, a Minor, Through His Parent and Guardian, MARY DOE; and MARY DOE, Individually, *

Plaintiffs, *

-vs- *

Case Number:
1:25-CV-0005-CEA-CHS

HAMILTON COUNTY DEPARTMENT OF EDUCATION, and HAMILTON COUNTY (THE HAMILTON COUNTY SHERIFF'S DEPARTMENT), *

Defendants. *

------------------------------------------------------

THE DEPOSITION OF

DEPUTY JASON BUCKNER

January 20, 2026

------------------------------------------------------

Diane R. Angel, RPR, TN LCR #246
Angel & Associates Court Reporting
P.O. Box 1145
Hixson, Tennessee  37343
(423) 876-4435 and 800-298-DEPO (3376)

2

APPEARANCES:

JUSTIN S. GILBERT, ESQUIRE
justin@schoolandworklaw.com
Gilbert Law, PLLC
100 W. Martin Luther King Boulevard
Suite 501
Chattanooga, Tennessee 37402
(423)756-8203
    Appearing for the Plaintiffs

DAN R. PILKINGTON, ESQUIRE
dpilkington@watsonroach.com
Watson, Roach, Batson & Lauderback, PLC
1500 Riverview Tower
900 South Gay Street
Knoxville, Tennessee 37901-0131
(865)637-1700
    Appearing for Hamilton County
    Department of Education

PAIGE IVEY EVATT, DEPUTY COUNTY ATTORNEY
pevatt@hamiltontn.gov
Hamilton County Attorney's Office
625 Georgia Avenue, Room 204
Chattanooga, Tennessee 37402
(423)209-6150
    Appearing for Hamilton County
    Sheriff's Department

ALSO PRESENT: Mary Doe
              Andrea Short
------------------------------------------------

3

INDEX OF EXAMINATION
DEPUTY JASON BUCKNER
Examination by Mr. Gilbert .......................5
Examination by Mr. Pilkington ....................57
Reexamination by Mr. Gilbert ....................63

INDEX OF EXHIBITS
1 - (For Identification) Defendant Hamilton ....16
  County Department of Education's Responses
  to Plaintiffs' First Interrogatories
2 - (For Identification) Student Threat ........30
  Assessment - Building Level Assessment
  Document
3 - Threats of Mass Violence PowerPoint ........31
4 - (For Identification) School Safety & .......38
  Security Document

5 - External Memorandum of Law from District ...40
  Attorney General Coty G. Wamp (8-29-24)
6 - Video ......................................48
7 - (For Identification) Individual Education ..48
  Program (IEP) for Student TP

8 - Witness Statement of TP ....................49

9 - (For Identification) Threat Assessment .....50
  Reporting Form
10 - Witness Statement of Nathan Winder .........60
11 - Witness Statement of Jill Keene ............61

4

        The deposition of DEPUTY JASON BUCKNER, called as a witness at the instance of the Plaintiffs, for purposes of discovery, pursuant to the Federal Rules of Civil Procedure, taken pursuant to notice on January 20, 2026, at the law offices of Gilbert Law, PLLC, 100 W. Martin Luther King Boulevard, Suite 501, Chattanooga, Tennessee 37402, commencing at 10:11 a.m., before Diane R. Angel, Registered Professional Reporter and Notary Public.

        S T I P U L A T I O N

        It being agreed between counsel for the respective parties that Diane R. Angel, Notary Public and Registered Professional Reporter, may swear the witness, take his deposition in machine shorthand, afterwards reducing the same to typewriting.

        All objections, except as to the form of the question and responsiveness of the answer, are reserved to on or before the hearing.

        It being further agreed that all formalities as to notice, caption, certificate, transmission, etc., including the reading of the completed deposition by the witness and the signature of the witness, are expressly waived.

5

        DEPUTY JASON BUCKNER, called at the instance of the Plaintiffs, having been first duly sworn, was examined and testified as follows:

        EXAMINATION

BY MR. GILBERT:

    Q    Can you give me your name for the record, please.

    A    Jason Buckner.

    Q    And do you go by Deputy Buckner?

    A    Yes.

    Q    Have you ever done this before, a deposition?

    A    No.

    Q    You've testified in court, I assume?

    A    Yes.

    Q    Okay. If I ask you something that doesn't make sense to you, just tell me. I'll be happy to repeat it or rephrase it. Okay. How long have you been a deputy?

    A    Twenty-six years.

    Q    Okay. How long have you been a school resource officer?

    A    I started in January of 2009.

    Q    And you're still an SRO?

**6**

A    Yes.

Q    And where are you currently assigned?

A    I'm at Soddy Daisy Middle School.

Q    Before that, where were you?

A    Ooltewah Middle School.

Q    All right.  And who is the principal at Ooltewah Middle?

A    Ms. Short.

Q    Is that Andrea Short?

A    Yes.

Q    Who's here with us today?

A    Correct.

Q    When were you an SRO at Ooltewah Middle, roughly the dates?

A    The last three years prior to this school year.

Q    And did you have standard hours when you were there?

A    Yeah.  6:45 to 2:45.

Q    Do you know who Japho Hardin is?

A    Uh-huh.

Q    Who is that?

A    He's our -- or he's the assistant principal.

Q    Am I saying that right?  Is it Jaypo

**7**

(phonetic) or Jaypho (phonetic)?

A    I just call him Mr. Hardin.

Q    Okay.  You said he's assistant principal?

A    Yes.

Q    And what about Whitney Ballard?  Do you know who that is?

A    Ballard?

Q    Whitney Ballard.

A    Is that the -- no.

Q    Okay.  What about Lorie Bowman?

A    Lorie Bowman?

Q    Uh-huh.

A    No.

Q    Have you had any conversations with Mr. Hardin about the young man in this case, TP, who had the stuff brought in his backpack?

A    Like from when to when?

Q    Anytime.  Let's get the universe first.

A    Other than that day, no.

Q    Okay.  So the universe of conversations you've had with Japho Hardin were on the date in question, which I believe was August 8th?

**8**

A    I believe so.

Q    Okay.  How many conversations would you have had with him on August 8th?

A    During this whole -- during the whole process, I mean, a couple, you know, back and forth, just...

Q    Were these in-person conversations?

A    Uh-huh.

Q    Yes?

A    Yes.  I'm sorry.

Q    That's all right.  So we've got two in-person conversations.  Do you remember about when the first conversation was?

        MR. PILKINGTON:  Object to the form.

A    I do not.

Q    (By Mr. Gilbert) You don't remember the first conversation?

A    (Moves head from side to side.)

Q    Do you remember when the second in-person conversation was?

A    No.

Q    About how long were these conversations?

A    I don't recall.

Q    Where were these conversations?

**9**

A    At Ooltewah Middle School.

Q    In somebody's office?

A    Probably in -- either my office or in the hallway.

Q    So you had your own dedicated office at Ooltewah Middle?

A    Yes.

Q    And what makes you think it might have been in the hallway?

A    Because we were standing in the hallway some as well.

Q    The hallway adjacent to your office?

A    Yes.  Right outside.

Q    For both of the conversation?

A    Yeah.  It's actually -- yes.  Well, either in or outside that.  I don't recall exactly.

Q    Was anyone else present during these two conversations you had with Mr. Hardin?

A    Ms. Short may have been.  Like I said, I don't recall.

Q    She may have been present in one or both?

A    I don't recall.

Q    What time of day were these conversations?

**Page 10**

A      I believe the incident took place after lunch. So it would have been after eighth grade lunch that day.

Q      Had you spoken to TP by the time you had these two conversations with Mr. Hardin?

A      No. I hadn't spoke to him. I think I spoke to Mr. Hardin first before I even spoke to TP.

Q      So both conversations with Mr. Hardin were before you spoke to TP?

A      The best I can recall.

Q      Okay. So the best you can recall, you did not have any further conversations with Mr. Hardin after you spoke with TP, correct?

A      You know, we -- he could have asked me about it or something, but it wasn't -- I don't know. Honestly, I don't know.

Q      You told me you believe, to the best of your recollection, there were only two conversations?

A      I believe so.

Q      So to the best of your recollection, you can't recall any further conversations after you spoke to TP?

A      No.

**Page 11**

Q      All right. Let's go to Ms. Short. You told me she might have been present for one or both of those conversations. Have you had any other conversations with Ms. Short about TP and a bunny in the backpack or the threat?

A      Unless it was -- no, not that I can recall, other than involving the incident that day.

Q      I'm including that day. You've told me she may have been present for one or both of those conversations you had with Mr. Hardin. Are there any other conversations that you had with Ms. Short that you can recall?

A      Not that I can recall.

Q      So as we -- let me strike that.
So the universe of conversations that you've had with Mr. Hardin and with Ms. Short would be the two that we've discussed?

A      That I can recall.

Q      Right. Did you ever get any email communications from Mr. Hardin about TP and the stuffed bunny in the backpack or the threat?

A      No.

Q      Did you ever get any email communications from Ms. Short about the backpack or the threat?

**Page 12**

A      No.

Q      Did you ever get any emails from Ms. Short about what kind of criteria you, Deputy Buckner, use to detain a student?

A      No.

Q      Who is your immediate superior?

A      Right now?

Q      Sure.

A      Sergeant Gaffin, Steven Gaffin.

Q      How long has he been your report?

A      Since the beginning of this school year.

Q      And who was it before that?

A      Sergeant Ed Merritt.

Q      We've talked about Mr. Hardin. We've talked about Ms. Ballard, Ms. Bowman, and Ms. Short. Is there anyone else employed by the school system that you can recall speaking to about TP and the backpack and the threat?

A      The -- Mr. Winder, the teacher that was in the class.

Q      Did you speak to Mr. Winder before or after your two conversations that you recall with Mr. Hardin?

A      I don't remember exactly what lineup

**Page 13**

that was, but it was around that same time.

Q      Did you speak to Mr. Winder before or after you spoke to TP?

A      Before.

Q      And where did that conversation take place?

A      In the hallway, I believe.

Q      Just outside your office?

A      Down by the eighth grade hallway.

Q      Did he come to you or you go to him?

A      I went to him.

Q      How did you know to go to him?

A      Because I was informed by Mr. Hardin what took place.

Q      So you would have spoken to Mr. Hardin before you spoke to Mr. Winder?

A      Yes.

Q      And so we've got Hardin, Winder, and TP?

A      Okay.

Q      Does that sound right to you?

A      I believe so, yes.

Q      Okay. So you go to Mr. Winder outside the eight grade classroom in the hallway. What does Mr. Winder tell you?

**14**

A    There was a threat made by TP, and I asked him to write a statement.

Q    Was anything more discussed than that?

A    Not very much. Just what occurred.

Q    Okay. Anyone else with the school that you've spoken to about TP or the backpack or the threat?

A    The best of my recollection, I think there was another adult in the classroom, I think an aide, and I cannot remember her name.

Q    Okay.

A    And I think I asked Mr. Hardin to ask her to write a statement as well.

Q    Okay. You don't think you spoke to her directly, though?

A    I don't believe I did. I don't recall.

Q    Have you reviewed any documents in preparation for the deposition today?

A    Just the petition and the prosecution report. That was it.

Q    When you say petition, do you mean -- well, you tell me what you mean by petition.

A    Juvenile petition. When I arrested

**15**

him, that is the paperwork I have to fill out.

Q    Where did you get the juvenile petition?

A    Where did I get it?

Q    Yeah.

A    Juvenile court. I mean, that's their paperwork.

Q    But you had to go get it to get prepared for this deposition, I take it?

A    No. I have it on my computer.

Q    Okay. Well, that's what I'm asking. Was it on your computer?

A    Oh, yeah. Yeah.

Q    And then you said a prosecution report?

A    Uh-huh.

Q    Was that on your computer as well?

A    Right.

MR. GILBERT: I guess I'm short one copy. Give me just a second.

MS. EVATT: Sure.

(Whereupon, a short pause was had.)

BY MR. GILBERT:

Q    All right. This first document I'm handing you I'm pretty sure you would have never

**16**

seen unless it was shown to you in this case. They're interrogatories answered by Hamilton County Department of Education. Have you ever seen these before?

A    I don't think so, no.

MR. GILBERT: Okay. Let's make these ID Exhibit Number 1 and then I'll ask you some questions about them, Deputy.

(Whereupon, the document, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 1 for identification.)

BY MR. GILBERT:

Q    If you'll flip over to page 4, Deputy Buckner, you should see question number 6 at the top of the page. Do you see that?

A    Uh-huh.

Q    The question asks, "Who, by name, was on the Threat Assessment Team? And state their role, including whether a member of law enforcement was included." Do you see that?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    Okay. The answer from the Hamilton

**17**

County School says, "The Threat Assessment Team consisted of Hamilton County Department of Ed employees Assistant Principal Japho Hardin and school counselor Whitney Ballard. SRO Buckner participated in the investigation and performed his independent assessment of the threat."

Is that right, that you performed an independent assessment of the threat?

A    Well, as far as like law -- the law side of it, yes.

Q    The probable cause law side of it?

A    Correct.

Q    All right. The answer goes on to stay, "The attached threat assessment included in Exhibit 7 identifies which portion of the assessment was completed by each individual. The role of the Threat Assessment Team is generally identified by state law."

So let me pull what was Discovery Exhibit Number 7 to see if you can recognize this. I'll represent to you that that is a reference to Discovery Exhibit 7. You'll see on the first page it says Student Threat Assessment - Building Level Assessment at the top.

A    Uh-huh.

**18**

Q      Yes?

A      Yeah, I can see that.

Q      Okay.  It's got 10 pages, as you'll see.  Have you ever seen this document before today?

A      I have not.

Q      Okay.  Let's look at page 1.  We'll kind of go through some things.

On the first page there's a box at the bottom right that says, "Building Level Assessment Completed by Site Team."  Do you see that?  It has six steps there.

A      Uh-huh.

Q      Yes?

A      Yes.  I'm sorry.

Q      It's okay.  Have you ever been on the -- or were you on a building level site team for TP?

A      No.

Q      Have you ever seen the steps that are to be completed by a building level assessment site team?

A      I have seen this paperwork, but I've never seen -- it's been all blank.  I've never seen anything filled out.

Q      Have you ever had any training on

**19**

these steps from anyone?

A      No.

Q      Okay.  Let's look at page 2.  The instructions you see there at the top?

A      Yes.

Q      In the second paragraph there, you see there's a reference to Building Level Site Team, and in parentheses, "A multidisciplinary team consists of an administrator, a school counselor, school social worker, or school psychologist, and a school resource officer."  Do you see that?

A      Uh-huh.

Q      Yes?

A      Yes.  I'm sorry.

Q      If you were not the school resource officer on the building level assessment team, do you know who would have been or if there was one?

MS. EVATT:  Objection.

Q      (By Mr. Gilbert) You can answer unless you don't understand.  And I can repeat or rephrase.

A      No.

Q      That's a no, you don't know of any other school resource office that would have performed that function?

**20**

A      No, I do not.

Q      Is there another school resource officer in Ooltewah Middle School?

A      No.

Q      So you would be the only one?

A      I was the only SRO there.

Q      Okay.  How about -- sticking with page 2 -- I know you've not had any training about step 1, step 2, or -- through step 6, but --

MR. PILKINGTON:  Object to form.

Q      (By Mr. Gilbert) -- is any of that your writing under step 1 and step 2, where the boxes are checked and where the information is filled out?

A      No.

Q      Do you know if that's Japho Hardin's handwriting?

A      I don't know anybody's -- I can't verify anybody's handwriting.

Q      Okay.  How about step 3 on page 3?  Is any of that your handwriting?

A      No.

Q      I take it nobody went over these questions with you, correct?

A      Correct.

**21**

Q      On page 4 it has questions 4 through 7, same question, did anybody at the school go over these questions with you?

A      No.

Q      Page 5, questions 8 through 12, same question, did anybody go over these questions with you?

A      No.

Q      Next page, page 6, did anybody go over these questions with you?

A      No.

Q      What about page 7?  Did anybody go over those questions with you?

A      No.

Q      How about page 8?  Did anybody go over that with you?

A      No.

Q      Page 9, there's a reference to IEP/504 plan about a quarter of the way down under School Options.  Do you see that?

A      Uh-huh.

Q      Do you know what an IEP is?

A      It's a plan for a student.

Q      Have you ever seen an IEP, a physical IEP for a student?

**22**

A    I have not.

Q    Do you know what the purpose of an IEP is?

A    If a kid needs any extra help or extra services or something.

Q    Do you know that it's for kids with disabilities?

A    Yeah.  I mean, it can be from -- my understanding, it's for any kind of disability, whether they have problems reading or need more time testing, stuff like that.

Q    Okay.  You said you've never seen any IEP.  I would take it then you've never seen TP's IEP?

A    Correct.

Q    Have you seen any of his educational records at all?

A    No.

Q    Do you have access to something called PowerSchool?

A    I do.

Q    What is PowerSchool?

A    It's the students' information, which shows what classes they're in and I guess in some things you can see their grades.

**23**

Q    What about IEPs?

A    I don't believe I have access to that.

Q    Do you use PowerSchool?

A    Yes, I --

Q    For what -- I'm sorry, go ahead.

A    Yes, I do.

Q    What kind -- what reason would you as an SRO be using PowerSchool?

A    To, A, locate a student of where they're at, what class they're supposed to be in, or who their teacher is, or if I need to get demographics.

Q    What are demographics?

A    Like address information, address, phone numbers, parent contacts.

Q    Is there a separate portal for IEP information within PowerSchool?

A    I don't know.  I've never seen any IEP, since I've been an SRO, within PowerSchool.

Q    Are psychological reports on a child kept within PowerSchool; do you know?

A    I do not know.

Q    Have you ever seen any psychological reports on TP?

**24**

A    I have not.

Q    Do you know what his IQ is?

A    I do not.

Q    We began by talking about your discussions with Japho Hardin and Andrea Short.  Did either of them ever mention anything to you about TP having a disability?

A    I believe that it was told to me that he had an IEP.

Q    Is that all?

A    The best I can recollect.

Q    And who told you that?

A    I would have -- I don't know exactly. It was either Mr. Hardin or Ms. Short.

Q    In one of those two conversations you told me about?

A    Yes.

Q    And the statement was, as best you can recall, he has an IEP?

A    I don't know if that was it exactly. I think it was a question asked, if he did or not.

Q    You asked the question, does he have an IEP?

A    Yes.

Q    Why did you ask the question if he

**25**

has an IEP?

A    It's good to know.

Q    Why would it be good to know whether he has a history of an IEP as a deputy?

A    Just, you know, if he's got anything or any services or anything like that that we need to be aware of.

Q    Any surfaces?

A    Service.

Q    Oh, services.  I'm sorry.  I guess what I'm trying to figure out is, in your mind why was that relevant?

A    When -- in my supervision chain of command the question is asked do they have an IEP and that's a question we have to ask so we can relay that, because anytime there is a threat of mass violence we notify our supervisors about it and that's a question that they ask us to ask.

Q    Do you know why you are to ask the question of whether they have an IEP?

A    No.

Q    But, nonetheless, you did ask the question?

A    Yes.

Q    And either Mr. Hardin or Ms. Short

26

answered the question in the affirmative?

A    Yes.

Q    Did you ask, what is the disability?

A    I do not recall that.

Q    Did they tell you what the disability was?

A    I do not recall that.

Q    As we sit here today, the most you can recall is you asked the question whether he has an IEP?

A    Correct.

Q    And you said that was per your chain of command and supervision?

A    Yes.

Q    What does that mean?

A    That means my supervisor, who at the time was Sergeant Merritt, and the lieutenant was Lieutenant Durham.

Q    And those were the procedures they told you to follow in the case of a threat of mass violence?

A    Uh-huh.

Q    Yes?

A    Yes. I'm sorry.

Q    Had you had to do that before this

27

situation with TP?

A    Had to -- explain.

Q    Had you ever had to confront an alleged threat of mass violence before TP's situation?

A    Yes.

Q    How many times would you say you've had to confront that?

A    I don't know an exact number, but, you know, I'd say more than ten.

Q    Okay. And so is that the standard protocol that you always follow, ask if there's an IEP?

A    Yes.

Q    And once you are told by the educators that there is in fact an IEP, tell me again what you do with that information.

A    I just let my supervisor know, along with the name of the student, the grade of the student, and what incident took place.

Q    So in this case that would be Sergeant Merritt; did you say?

A    Uh-huh. Yes.

Q    And is this a report you would fill out for Sergeant Merritt, or you tell him orally, or

28

what?

A    Tell him verbally, yes.

Q    And did you do that in TP's case? You told Sergeant Merritt verbally that he had an IEP?

A    Yes.

Q    Did he ask you to get any more information about the IEP?

A    No.

Q    Did he ask you what kind of disability?

A    No.

Q    Did he ask if there was an intellectual disability?

A    No.

Q    Did Mr. Hardin or Ms. Short offer you any educational documents about the disability?

A    No.

Q    Did you ask for any?

A    No.

Q    Have you ever been a teacher?

A    No.

Q    Do you have any background in special education?

A    No.

29

Q    What about student testing, like testing of students with autism or intellectual disability?

A    No.

Q    I'm going to guess that you haven't heard of this test, but you tell me if I'm wrong, the Comprehensive Test of Nonverbal Intelligence, sometimes called the CTONI?

A    No.

Q    You've never heard of that?

A    No.

Q    What about the Adaptive Behavior Assessment System, ABAS? Have you ever heard of that?

A    No.

Q    You said you've probably had about ten occasions where you were confronting an alleged threat of mass violence?

A    Or more, yes.

Q    All right. Did you follow the same protocol in all of those situations that you did in this case?

A    Yes.

MR. GILBERT: Did I mark that as Exhibit 2 yet?

**30**

THE COURT REPORTER: No.

MR. GILBERT: All right. Let me do that.

MR. PILKINGTON: Is that for ID?

MR. GILBERT: Yes.

(Whereupon, the document, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 2 for identification.)

BY MR. GILBERT:

Q Let me show you something I think you may have seen. Do you recognize these PowerPoint slides?

A Yes.

Q Can you identify for me what they are?

A It's a PowerPoint of Threats of Mass Violence that was given to us to start going over and teaching kids -- or making sure every kid in the school saw it.

Q Who gave it to you?

A My staff or support -- supervision in the sheriff's office.

Q Your staff support supervision?

A No, no. My supervision, the

**31**

supervision in the SRD.

Q Who would that be?

A It was Lieutenant Durham, and it was sent out to us to start doing this presentation.

MR. GILBERT: Let's make that Exhibit 3.

(Whereupon, the document, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 3.)

BY MR. GILBERT:

Q You believe this was sent to you by Lieutenant Durham?

A Yeah, I believe so.

Q Okay. Did you get any training to go with this, or was it just a PowerPoint sent to you?

A It was a PowerPoint sent to us.

Q And your instruction was to do what with it?

A Teach this to the kids.

Q Was this sent to all the SRDs?

A I believe so.

Q Was it to teach it to the kids or was it to teach it to the teachers and staff, or both?

A Teach it to the kids, make sure we give presentations for the kids.

**32**

Q Okay. And so was there an assembly where you went through this PowerPoint?

A I went to every related arts class.

Q Okay. And you went through the slides, I take it?

A Yes.

Q Do you remember when that was done?

A I typically don't do any safety -- any kind of safety with the schools until after about the first month of school, because the first few weeks of school are chaotic with kids getting classes changed and schedule changing and getting -- you know, the administration and everything has their hands full with a lot of movement with kids and things going on. So I'm not trying to throw a wrench in their schedule the first month, so I don't teach this stuff until after about the first month of school.

Q Okay. And you said we went into every related arts class; is that right?

A Yes.

Q Do all students have a related arts class?

A I mean, I think everybody that I've seen has two related arts classes.

**33**

Q What are related arts classes?

A Like math -- oh, I'm sorry. Not math. PE, art, you know, band, chorus, things like that.

Q Did you ever do any presentations to faculty or staff at Ooltewah?

A Yes. I would go in and talk to staff members during their planning periods.

Q Okay. On the subject of threats of mass violence?

A Yes. I do that every year.

Q Okay. And was that something that Lieutenant Durham instructed you to do?

A It's just something that I do because if questions pop up, I'd like to answer them from the faculty.

Q And you said you would have had these discussions -- when did you say?

A During the teachers' planning periods.

Q Are these teacher by teacher or a group of teachers?

A Usually like, say, eighth grade teachers have the same planning period.

Q Okay.

**34**

A   And I would try to address the teachers during that.

Q   And would that have also been roughly a month or so after the beginning of school?

A   Correct.

Q   And did you deliver the same PowerPoint?

A   Not this one.

Q   Did you have a different one?

A   I did.

Q   Okay. Do you have one on your computer?

A   I do, as well as -- it's on YouTube as well.

Q   What's the key distinctions between the PowerPoint you deliver to kids versus the one you deliver to faculty and staff?

A   I give -- this one was given to us after and we did it -- I didn't do this with staff. The other one I did with staff, and I typically do that one with staff and students.

Q   Okay. The Exhibit 3, you're saying, was just kids?

A   Yes.

Q   The other PowerPoint, you're saying

**35**

you did it for kids and teachers?

A   Correct.

Q   And so when would that have been done?

A   After the fact. You know, after a month or so.

Q   Okay. And is that the one that's on YouTube?

A   Yes.

Q   And did you have to go through any training to put that together or did someone give that to you?

A   It's a part from the iloveuguys.org. It's a standardized response protocol that goes on about lockdowns, lockdown drills, and things like that.

Q   Did you have to look at the school's threat assessment procedures to determine if there were any conflicts or if the protocols were all the same between what you were delivering from the iloveuguys and what protocols the school had in place already?

A   Well, that was talking more about lockdowns and security and safety of the buildings and incidents like that and what to do, and this is

**36**

more of threat of mass violence.

Q   Okay. Let me sharpen the question then. Had you done any PowerPoint on threats of mass violence with faculty and staff?

A   No, not -- no.

Q   Okay. And what about when you're talking about these planning periods when the eighth grade teachers would meet as a group? Did those discussions concern alleged threats of mass violence?

A   No. That just talked about lockdowns.

Q   Okay. So as I understand it -- you correct me if I'm wrong -- you did some training of the kids about threats of mass violence but not the faculty and staff?

A   Correct.

Q   How about yourself? Are you required to undergo any training about threats of mass violence put on by Hamilton County Department of Education?

A   We just actually did a staged active shooter drill. We do active shooter training. That's typically what we do.

Q   What about verbal threats of mass

**37**

violence? Have you undergone any -- have you sat through trainings that Hamilton County Department of Ed puts on for that?

A   Department of Ed, no.

Q   Or Ooltewah Middle School?

A   No.

Q   You wouldn't have ever sat on a threat assessment team to determine the validity of an alleged threat of mass violence with school officials, would you?

MR. PILKINGTON: Object to the form.

Q   (By Mr. Gilbert) If you understand, you can answer.

A   I'm looking to find probable cause.

Q   Right.

A   And that's all I'm doing.

Q   Okay. All right. So you would not be sitting down with school officials looking at educational records, circumstances --

A   No.

Q   -- and doing that kind of threat assessment?

A   No.

Q   I'm correct, right?

A   I would not be doing that.

**38**

Q Okay. I'm handing you a document that has been produced to me from the school system. Have you ever seen this document before?

A I have not.

MR. GILBERT: All right. Let's make that ID Exhibit 4.

(Whereupon, the document, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 4 for identification.)

BY MR. GILBERT:

Q And I know I'm showing you stuff you haven't seen before, but it's part of me finding out what you know and don't know.

This next document I'm handing you is an External Memorandum of Law, written by District Attorney General Coty G. Wamp, dated August 29, 2024, to Sheriff Austin Garrett. Have you ever seen this before?

A Yes.

Q When did you first see this?

A That, I -- I can't tell you a date. I don't know.

Q What was the circumstance of you seeing it?

**39**

A I believe this was -- this was the document that I saw last week.

Q Is that the first time you saw it?

A To my recollection, yes.

Q All right. How did you come across it last week?

MS. EVATT: Objection.

Q (By Mr. Gilbert) Where did you see it?

A In the County Attorney's office.

Q What was your purpose for reading it last week?

MS. EVATT: Objection.

Q (By Mr. Gilbert) You can answer.

A I didn't really have a purpose.

Q Who provided it to you?

A The County Attorney's office.

Q Did you read it?

A I glanced over it.

Q Have you ever had any conversations with Sheriff Austin Garrett about the subject of threats of mass violence in schools?

A Personally, no.

Q What do you mean by that? Would there have been some indirect communications by

**40**

document or email or something?

A No. He's never walked up to me and talked to me about it, so...

MR. GILBERT: Okay. All right. Let's make that -- are we up to Exhibit 5?

THE COURT REPORTER: Yes.

MR. GILBERT: We'll make that Exhibit 5.

(Whereupon, the document, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 5.)

BY MR. GILBERT:

Q Have you reviewed the body cam video involving TP?

A When I arrest him?

Q Yeah.

A I have not reviewed it, no.

Q Have you ever seen it?

A I -- some things I go back and review and some things I don't, and I didn't.

Q Okay.

A There was nothing really questionable that I had to go back and review for.

Q All right. You'd recognize it if I showed it to you, wouldn't you?

**41**

A Yes.

MS. EVATT: While you're setting that up, do you mind if I step out for just one moment?

MR. GILBERT: Yeah. We can take a five-minute break.

MS. EVATT: Thank you.

(Whereupon, a short break was had.)

BY MR. GILBERT:

Q All right. I have subpoenaed the body cam video. I'll put it up on the screen for you. Do you recognize the face at the beginning of this video?

A Yes.

Q Who is that?

A Mr. Hardin.

Q Okay. It's silent until about 35 seconds.

(Video played.)

BY MR. GILBERT:

Q Did you hear that, "Here's the deal"?

A (Moves head up and down.)

Q Is that you speaking there?

A It is.

Q All right. I'll back up. I want to ask you a question.

(423) 876-4435      "Preserving The Record"      (800) 298-3376
Diane R. Angel, RPR    Angel & Associates Court Reporting
Case 1:25-cv-00005-CEA-CHS   Document 52-1   Filed 07/17/26   Page 11 of 18
PageID #: 401

**Page 42**

(Video played.)

BY MR. GILBERT:

Q All right. So we just listened to you saying, quote, Hey, TP, here's the deal. You're going to have to come with me. You're going to be charged with school threats because you can't make comments about blowing up the school," right?

A Yes.

Q On this video, in the top right-hand corner we've got the date 8/8/2024, right?

A Yes.

Q And then it says 12:08. Is that noon -- eight minutes after noon?

A Yes.

Q Okay. And going back to our earlier conversations, you had spoken to -- was it Widner {sic}?

A Winder.

Q Winder. And you had two conversations with Mr. Hardin and possibly Ms. Short.

At the time you said, "You're going to be charged with school threats because you can't make comments about blowing up the school," had you looked in the backpack?

**Page 43**

A Mr. Hardin opened the backpack and looked in, and I looked in the backpack and saw the stuffed animal.

Q Okay. Was that before you made the comment that we're just talking about, when you saw the stuffed animal?

A Yes.

Q And so was that right outside in the hallway that the two of you saw the stuffed animal?

A I don't recall exactly where we were at, but...

Q But you opened the backpack together?

A Yes.

Q Okay. And the probable cause for the arrest, was it him making comments about blowing up the school?

A Yes.

Q And as I understand it, at the time that you made the decision to arrest him you had no information about him having any specific type of disability; is that right?

A No. It's just day two of school.

Q You just knew he had an IEP and that's it?

A That's it.

**Page 44**

Q I don't know if you've actually ever seen an IEP, but I'll represent to you that this is TP's IEP.

If you'll turn to page 13 of the document, which is three pages from the back -- do you see page 13 down there, and above it it says PLF00041?

A Yes.

Q Okay. Go three -- the third paragraph from the bottom that begins with, "The IEP team has considered," do you see that?

A Uh-huh. Yes.

Q Do you know what an IEP team is?

A I'm assuming it's some teachers and counselors.

Q Okay. Have you ever been part of an IEP team?

A No.

Q His IEP states in that paragraph, "The IEP team has considered multiple sources of information and data showing that the student demonstrates the most significant cognitive disability."

Did Ms. Short or Mr. Hardin ever give you any kind of descriptive information about his

**Page 45**

cognitive disability?

A I don't recall.

Q Okay. Did you read TP his Miranda warnings, Miranda rights?

A I did not.

Q Why would you not -- did you arrest him?

A Uh-huh.

Q Yes?

A Yes.

Q Why would you not read him his Miranda rights under this circumstance?

A I just didn't. I wasn't going to ask him any questions or, you know, take any -- I wasn't doing any -- interrogating him or anything, so I did not.

Q So you didn't ask him any questions?

A No.

Q All right. I just want to make sure that we've authenticated this body cam. Where is the body cam? Is it literally on your body or do you put it on the table?

A (Indicating.)

Q Oh, you've got it on you right now. Okay. Am I being videoed?

**46**

A    Maybe.

Q    Am I?

A    No.

Q    Okay.

A    Do you want to be?

Q    No, not particularly.

A    Most people say that.

Q    All right. Let's just make sure all this is your -- I'm assuming this is all your body cam video. You would have had it on during the time you arrested him and then taking him into the car?

A    Yes.

Q    All right. I'm just kind of scrolling through it here without us having to watch an hour and a half, but you would have kept it on continuously?

A    Yes.

Q    And so you take him in the patrol car, right?

A    Correct. That's not my -- up there, what popped up there, that wasn't my camera.

Q    That's a screen saver. Not your video.

Okay. We're at -- I'm at 51:38 of the video. Where is this?

**47**

A    Juvenile court.

Q    Okay. That's where you took him?

A    Correct.

Q    And where is this at 49:49 on the right-hand side?

A    That is inside, as soon as you walk in to -- kind of like their control area, where you talk to the people inside.

Q    Okay. And what about this hallway at 47:06 on the right side?

A    That is me sitting down, typing up the paperwork.

Q    Okay. Let's see. So you keep your body cam going even during that, huh?

A    Yes.

Q    Okay. Who is this gentleman at 19:01 on the right-hand side?

A    I don't know. Somebody who works for Juvenile court.

Q    Okay. How do you know when to turn your body cam off?

A    When I get done.

Q    And at what point is that?

A    When I'm done. Usually when I walk out of the building.

**48**

Q    Get back in the car?

A    Yeah.

Q    Okay. And so does this look like the complete body cam as it relates to the arrest of TP?

A    Yes.

MR. GILBERT: Okay. All right. Let's make -- I've got this on a jump drive for you, but we'll make it Exhibit 6.

(Whereupon, the video, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 6.)

MR. GILBERT: And then the IEP, which you haven't seen, we'll make for ID as Exhibit 7.

(Whereupon, the document, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 7 for identification.)

BY MR. GILBERT :

Q    You previously told me you did not read him his Miranda rights because you did not interrogate him. Have you ever seen his -- have you ever seen TP's statement?

A    I believe I did.

Q    Is that a copy of it?

A    Yeah.

**49**

Q    It says, "I don't want nobody to look in my backpack because of my bunny plush"?

A    Yes.

Q    All right. Did you direct that he give a statement?

A    Statements were taken from school -- administrative staff, Mr. Hardin, I believe.

Q    He did that independently of you?

A    Yes. And I got a copy of it.

Q    Did you have a copy of this before you arrested him?

A    Yes.

MR. GILBERT: Okay. All right. Let's make that Exhibit 8.

(Whereupon, the document, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 8.)

BY MR. GILBERT :

Q    This next document I'm handing you states near the top, "Threat Assessment Reporting Form." I see Mr. Hardin's name on there. Have you ever seen this document?

A    I have not.

Q    Do you know whether the threat assessment team that the school put together

**Page 50**

**determined the threat to be violent?**

A    I do not.

MR. GILBERT:  All right.  Let's make that last document Exhibit 8 for ID.

MS. EVATT:  I think that will be 9.

MR. GILBERT:  Excuse me, Exhibit 9 for ID.

(Whereupon, the document, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 9 for identification.)

BY MR. GILBERT:

**Q    Do you know what the consequence to a student at the Hamilton County Department of Education school is when an SRO makes a decision to arrest?**

A    That's -- I leave that up to the administration.

**Q    So when you say "the administration," like the principal?**

A    Principal, assistant principal, whoever is in charge of handling that situation.

**Q    You don't know then what the rules are or if they're bound by any rules in terms of the effect of an arrest?**

**Page 51**

A    Huh-uh.

**Q    No?**

A    No.

**Q    Would you have done anything differently if Ms. Short or Mr. Hardin or anyone at Hamilton County had said, Deputy Buckner, TP has an intellectual disability?**

MR. PILKINGTON:  Object to form.

**Q    (By Mr. Gilbert) You can answer.**

A    I don't know.  I went with what I had with me at the time and it met my probable cause to make that arrest.

**Q    And so you don't know?  So if they told you he has an intellectual disability that can affect his ability to understand and communicate, would that have made any difference to you?**

A    I mean, yeah.  I would have taken it into consideration.  But, you know, at the same time too, we have to -- you know, that met -- for probable cause reasons, you know, we went with that -- I went with that because that's what we did at the time.  And I didn't have -- I didn't have, you know, all this stuff.

And not only that, that would have been something that I would have possibly contacted

**Page 52**

a sergeant or somebody and notified them and talked to them about, but at the time that's what happened.

**Q    Is it fair to say that had you known he had an intellectual disability that you might have brought that information to your sergeant to discuss it before making a decision to arrest?**

A    Yeah.  I would have brought everything I had.  But at the time all I knew is he had an IEP or a 504, whichever one it was, and, you know, it met the criteria for...

**Q    I'm trying to change the scenario.  I understand what you've told me happened.  I'm adding some additional facts for you.**

**If Ms. Short or Mr. Hardin had given you additional information, that this kid has an intellectual disability that affects his judgment, would that have been relevant to you in your analysis?**

A    It's hard to say because it was, you know -- I think no.  He would have went to jail, because we would -- we're having -- at the time we were having -- in the previous school year and that would have been a lot of threats of mass violence.

**Q    And so it wouldn't have mattered if he has an intellectual disability.  He would have**

**Page 53**

**went to jail because he said the magic words, so to speak?**

A    Yes.  But a lot of the situations with these incidents where we look at making an arrest, it's not making an arrest for discipline, because we know juvenile is not a court of discipline.  They're a court of rehabilitation.

And if that could get him -- which I know they do.  Once you get arrested for that charge, you get a mental evaluation done.  I think that's required.

So it's also a foothold into getting counseling and getting extra help, you know, whether or not a parent can get that or have that already on them, but it actually gives them an opportunity for resources.

**Q    Was he handcuffed?**

A    Yes.  Our policy is everybody gets handcuffed.

**Q    Have you received any training on the threat of mass violence law?**

A    Yes.

**Q    And that training came from who?**

A    Our sheriff's office.

**Q    But, specifically, who?**

**Page 54**

A Training division. I couldn't tell you the exact person who did it. We've had quite a few training things throughout the years.

Q Do you remember whether you had that training at the time you arrested TP?

A Yes.

Q Do you know whether the threat of mass violence law applies to kids with intellectual disabilities?

A I know that it's in there.

Q What's in there?

A I know that there's different things that are in that thing that are in the statute that, you know, that -- I'm trying to explain it.

Q My question is pointed. Do you know whether that law applies to kids with intellectual disabilities?

A It's -- I think it's -- I don't know. You know, I've got the intellectual part, because -- there's an intellectual part in there, but I think, in my understanding, it was for like severe, like needing somebody to walk around with them and assistance, that kind of assistance.

Q Where did you get that idea?

A It's -- well, I mean, that's the way

**Page 55**

I interpret it.

Q I know. I'm asking where you came up with that idea, that someone needed to have assistance walking around?

A It's not just -- I'm just giving that as an example. I'm not saying that every person is like that.

Q Is that part of your training that you were given that understanding?

A No.

Q Okay. Were these written training materials?

A I don't recall, to be honest.

Q You haven't received any training about threats of mass violence from the school side, have you?

A No.

MR. GILBERT: All right. Let's take about five minutes, and I think I'm almost done. Okay?

THE WITNESS: Okay.

(Whereupon, a short break was had.)

BY MR. GILBERT :

Q All right. Deputy, I just have a few other things for you. Did you consult with anyone

**Page 56**

at the sheriff's office before arresting TP?

A Yes. My supervision.

Q Who would that have been?

A Sergeant Merritt and Lieutenant Durham.

Q Were they together?

A Yes.

Q Was this a phone call?

A Yes.

Q All right. What specifically did you ask them?

A I don't recall that. I just know that any time we have a threat of mass violence we notify our supervision.

Q So was it just more of a notification?

A Yeah, notification and just informing them of the situation, because they've got to answer to people too.

Q Were you asking them for guidance or just notifying them of what you were going to do?

A Notifying them.

Q So they don't opine on whether you should or should not arrest?

A Right.

**Page 57**

Q You're now at Soddy?

A Middle School, yes.

Q Do you use the same procedures now for threats of mass violence at Soddy that you used at Ooltewah Middle?

A Yes.

Q What occasioned your move from Ooltewah to Soddy?

A Just the opportunity to be -- closer drive home.

MR. GILBERT: Okay. All right. I think that's all the questions I've got. I do have a housekeeping matter. If y'all don't mind, we could use the name John Doe instead of TP so we don't have to redact all of that.

MS. EVATT: No objection.

MR. GILBERT: Is that agreeable?

MR. PILKINGTON: That's agreeable. And I will have a few questions.

MR. GILBERT: Okay.

EXAMINATION

BY MR. PILKINGTON:

Q Deputy Buckner, my name is Dan Pilkington. I represent the Department of Education, essentially the school system, in this

58

case. I just have a few questions for you. I will try not to tread over any ground or any questions that have previously been asked of you.

Like Mr. Gilbert said, if you don't understand one of my questions, will you let me know?

A    Yes.

Q    You're not an employee of the Hamilton County Department of Education, are you?

A    No.

Q    And the incident we've been talking about today, that occurred back in August, on August 8 of 2024; does that sound accurate?

A    Yes.

Q    We're in January of 2026 now?

A    Yes.

Q    You mentioned that you had multiple conversations with the AP, Mr. Hardin, and the principal, Ms. Short.

Testifying here under oath today, can you say specifically how many conversations you had with either Mr. Hardin or Ms. Short on that day?

A    I cannot. I didn't -- it's been a while. I don't remember.

Q    Sure. And it's also fair to say that

59

you don't recall specifically verbatim everything that either the principal or the AP told you that day?

A    Correct. Yes.

Q    But would you agree with me that you did have discussions with the administration, the school employees there about kind of the details of the incident?

A    Yes.

Q    And you obtained written statements, the statement that had been made by the student?

A    Yes.

Q    I'm going to hand you two documents, and I believe these are the written statements. Please let me know if you recognize those two documents.

A    Yes.

Q    And let's look at the one with Nathan Winder at the top. Do you see that one?

A    Yes.

Q    Who is Nathan Winder?

A    He's a teacher at Ooltewah Middle School.

Q    And is this a statement you were provided by the school system on August 8th, 2024?

60

A    Yes.

MR. PILKINGTON: Let's make that the next exhibit to Deputy Buckner's deposition, please.

(Whereupon, the document, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 10.)

BY MR. PILKINGTON:

Q    And in addition to receiving this written statement by Mr. Winder, do I understand you also had a conversation with Mr. Winder?

A    As best I can recollect, I think it was just like a brief, tell me what happened, you know.

Q    Okay. Looking at the other statement, can you read the name of the individual that prepared the other statement?

A    It looks like Jill Keene.

Q    And is that the other adult that was in the room when the statement was made by the student?

A    Yes.

Q    And were you provided a copy of that statement before you made your decision with respect to probable cause?

A    Yes.

61

Q    Do you recall having any direct conversations with Ms. Keene?

A    No.

MR. PILKINGTON: Let's make that the next exhibit to Deputy Buckner's deposition, please.

(Whereupon, the document, as referred to above, was marked to said deposition and will be attached hereto as Exhibit Number 11.)

BY MR. PILKINGTON:

Q    And do I understand correctly, Deputy Buckner, that the results of the school system's investigation and the ultimate result of their threat assessment, that does not ultimately control or compel your decision as a law enforcement officer regarding probable cause?

A    Yes, it does not.

Q    You perform your own independent investigation and use your discretion to determine whether or not probable cause exists for arrest?

A    Yes.

Q    And that's what you did in this case?

A    Yes.

Q    You had an opportunity to ask any questions of the faculty and staff there at Ooltewah Middle School on that day, didn't you?

**Page 62**

A   Yes.

Q   And did they answer all of your questions?

A   Yes.

Q   If you felt like you needed more information from the school or any employee there to reach a probable cause determination, you could have obtained that information from those employees of the school system, couldn't you?

MR. GILBERT:  Object to form.

A   Yes.

Q   (By Mr. Pilkington) Deputy, you didn't ask any questions and they told you, no, we're not going to answer that, did they?

A   They did not.

Q   And you weren't prevented then from asking any additional questions that you might have wanted to know about or needed for your probable cause determination, were you?

A   No.

Q   The school system has no authority whatsoever to direct your activities regarding whether or not to arrest a student, do they?

A   No.

Q   And the decision to arrest a student

**Page 63**

in this case, that was solely your decision?

A   Yes.

MR. PILKINGTON:  That's all the questions I have.  Thank you, Mr. Buckner.

MR. GILBERT:  I just have a few follows-ups on that.

REEXAMINATION
BY MR. GILBERT :

Q   You never saw the IEP and you were never a part of the school's threat assessment team, correct?

A   Yes.

Q   That is correct?

A   That is correct.

Q   As part of your probable cause analysis as a police officer, you're not entitled to look at those school records, are you?  Those are private?

MR. PILKINGTON:  Object to form.

A   I mean, I've never asked for them.

Q   (By Mr. Gilbert) Do you know whether you're entitled as a police officer without parental consent to get educational records?

A   I've never asked for records.

Q   So you don't know?

**Page 64**

A   I don't know.  But I've never needed it for probable cause.

Q   And as part of a threat assessment team member acting as a school official, as opposed to probable cause, do you know if you would have the right to look at those records?

A   I do not.

Q   Do you know whether Ms. Short and Mr. Hardin would have violated TP's rights by giving you his IEP information and educational records when you were carrying out probable cause?

A   Say that again.

Q   I understand that you didn't have the IEP and you didn't have any educational records during your probable cause analysis.

A   Correct.

Q   My question is, do you know whether Ms. Short and Mr. Hardin could have given you those or whether that would have violated TP's rights?

A   They didn't.

Q   Okay.  But you don't know if that would have violated --

A   I don't know if they can or can't.  I don't know.

Q   Do you understand whether there's a

**Page 65**

different analysis between probable cause when you're acting as a police officer versus a threat assessment for validity of a threat; do you know?

A   I don't understand what you're asking.

Q   Do you know whether there is a different criteria that you have as a police officer determining probable cause and the information you have access to versus the information that a threat assessment team that includes the SRO would have access to and the criteria they use?

A   No.

Q   Have you ever thought about that before me asking you that question right now?

A   No.

Q   Have you had any training from the County about how the First Amendment applies to schools?

A   Not that I can recollect.

Q   Have you ever heard of the True Threat Doctrine?

A   I have not.

Q   The Counterman Doctrine?

A   I have not.

MR. GILBERT:  That's all the

66

questions I have.

MR. PILKINGTON: Nothing further.

MS. EVATT: I don't have anything.

FURTHER THIS DEPONENT SAITH NOT.

(Signature waived.)

67

REPORTER'S CERTIFICATE

STATE OF TENNESSEE :

:

COUNTY OF HAMILTON :

I, Diane R. Angel, RPR, do hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption; that DEPUTY JASON BUCKNER was duly sworn by me; that pages 1 to 67, inclusive, were reduced to typewriting under my direction and supervision, and the deposition is a true and correct record, to the best of my ability, of the testimony given by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action. All rates charged are usual and customary.

This the 26th day of January, 2026.

_Diane R. Angel_

DIANE R. ANGEL, RPR, TN LCR #246

Licensed Court Reporter and

Notary Public (ID #0429178).

Commission Expires: 3/06/2029